No.  23-4107

# United States Court of Appeals for the Tenth Circuit

---

**ZEBEDIAH GEORGE DALTON, et al.,**

*Plaintiffs-Appellants,*

**v.**

**JOSEPH R. BIDEN, et al.,**

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Utah
No. 4:22-CV-00059 (Hon. David O. Nuffer)

---

**OPENING BRIEF OF INDIVIDUAL PLAINTIFFS
ORAL ARGUMENT REQUESTED**

---

James M. Burnham
KING STREET LEGAL, PLLC
800 Connecticut Ave., N.W., Ste. 300
Washington, D.C. 20006
Telephone: (602) 501-5469
james@kingstlegal.com

Brady Brammer
BRAMMER RANCK, LLP
1955 W. Grove Parkway, Ste. 200
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
bbrammer@brfirm.com

Brett A. Shumate
Harry S. Graver
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
bshumate@jonesday.com

*Counsel for Individual Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF RELATED CASES ......................................................... ix

INTRODUCTION ......................................................................................... 1

JURISDICTIONAL STATEMENT ............................................................... 3

STATEMENT OF THE ISSUES .................................................................. 3

STATEMENT OF THE CASE ...................................................................... 3

    A.    The Antiquities Act. ................................................................. 3

    B.    Grand Staircase-Escalante and Bears Ears. ............................. 7

    C.    President Biden's Proclamations. ............................................. 8

    D.    This Lawsuit. .......................................................................... 10

I.    THE PROCLAMATIONS EXCEED THE PRESIDENT'S STATUTORY AUTHORITY UNDER THE ANTIQUITIES ACT ...................................... 14

    A.    The Antiquities Act Confers a Limited Power. ....................... 15

    B.    The Proclamations Exceed the Antiquities Act's Limits. ......... 25

    C.    The Government's Position Would Render the Act Limitless ....... 29

    D.    The Proclamations' Excesses Render Them Unlawful in Full. ...... 32

II.    SOVEREIGN IMMUNITY ACCORDINGLY DOES NOT BAR THIS SUIT. ............... 35

    A.    Sovereign Immunity Does Not Cloak Acts in Excess of Authority ...................................................................................... 36

    B.    The APA Independently Waives Sovereign Immunity. .......... 44

CONCLUSION ........................................................................................... 46

REQUEST FOR ORAL ARGUMENT ....................................................... 47

CERTIFICATE OF COMPLIANCE ......................................................... 48

CERTIFICATE OF DIGITAL SUBMISSION ............................................ 49

CERTIFICATE OF SERVICE .................................................................... 50

ADDENDUM: Memorandum & Order Granting Motions to Dismiss, ECF 180 (Aug. 11, 2023) ........................................................ Add. 1

ADDENDUM: Judgment Dismissing Case with Prejudice, ECF 181 (Aug. 11, 2023) ........................................................................ Add. 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
141 S. Ct. 2485 (2021) ................................................. 31

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) ....................................... 38

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ..................................................... 37

*Backcountry Hunters & Anglers v. U.S. Forest Serv.*,
612 F. App'x 934 (10th Cir. 2015) ................................. 35

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ................................................. 31

*Bowen v. Mich. Academy of Family Physicians*,
476 U.S. 667 (1986) ..................................................... 41

*Brnovich v. Biden*,
562 F. Supp. 3d 123 (D. Ariz. 2022) .............................. 45

*Cameron v. United States*,
252 U.S. 450 (1920) ..................................................... 23

*Cappaert v. United States*,
426 U.S. 128, 141 (1976) .............................................. 24

*Chamber of Commerce v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) .................................. 38, 42

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ..................................................... 43

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001) ..................................................... 16

*Clinton v. Jones*,
520 U.S. 681 (1997) ..................................................... 42

*Dakota Cent. Tel. Co. v. S.D. ex rel. Payne*,
    250 U.S. 163 (1919) ................................................................. 43

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................. 37, 42, 43, 44

*Dugan v. Rank*,
    372 U.S. 609 (1963) ................................................................. 37

*Florida Dept. of State v. Treasure Salvors, Inc.*,
    458 U.S. 670 (1982) ................................................................. 36

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................. 45

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ................................................................. 35

*Hennessey v. Univ. of Kansas Hospital Auth.*,
    53 F.4th 516 (10th Cir. 2022) ................................................. 14

*Int'l Primate Protection League v. Administrators of Tulane Educ. Fund*,
    500 U.S. 72 (1991) ................................................................. 37

*Larson v. Domestic & Foreign Commerce Corp.*,
    337 U.S. 682 (1949) ............................................. 37, 39, 40, 41, 42

*Mass. Lobstermen's Ass'n v. Raimondo*,
    141 S. Ct. 979 (2021) ................................1, 2, 5, 6, 18, 22, 23, 27, 28, 30, 32

*Mass. Lobstermen's Ass'n v. Ross*,
    349 F. Supp. 3d 48 (D.D.C. 2018) ......................................... 38

*Mass. Lobstermen's Ass'n v. Ross*,
    945 F.3d 535 (D.C. Cir. 2019) ........................................... 23, 28

*Match-E-Be-Nash-She-Wish Band of Pottowatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ................................................................. 44

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999) ................................................................. 45

*Mountain States Legal Found v. Bush*,
    306 F.3d 1132 (D.C. Cir. 2002) ............................................. 43

*Murphy Co. v. Biden*,
    65 F.4th 1122 (9th Cir. 2023) ........................................ 39

*Nat'l Parks & Conservation Ass'n v. FAA*,
    998 F.2d 1523 (10th Cir. 1993) ...................................... 34

*Niz-Chavez v. Garland*,
    141 S. Ct. 1474 (2021) ................................................... 15

*Silva v. United States*,
    45 F.4th 1134 (10th Cir. 2022) ...................................... 14

*Simmat v. U.S. Bureau of Prisons*,
    413 F.3d 1225 (10th Cir. 2005) ....................... 36, 37, 42, 44

*Sw. Airlines Co. v. Saxon*,
    596 U.S. 450 (2022) ...................................................... 16

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ................................... 39, 44

*Tanzin v. Tanvir*,
    141 S. Ct. 486 (2020) .................................................... 16

*United States v. California*,
    436 U.S. 32 (1978) .................................................... 24, 29

*United States v. George S. Bush & Co.*,
    310 U.S. 371 (1940) ...................................................... 43

*United Tribe of Shawnee Indians v. United States*,
    253 F.3d 543 (10th Cir. 2001) ...................................... 38

*Utah Ass'n of Cntys. v. Bush*,
    1999 U.S. Dist. LEXIS 15852 (D. Utah Aug. 12, 1999) ............ 8, 22

*Utah Ass'n of Cntys. v. Bush*,
    316 F. Supp. 2d 1172 (D. Utah 2004) ........................... 7, 22

*Verizon Md., Inc. v. Pub. Serv. Com'n of Md.*,
    535 U.S. 635 (2002) ...................................................... 37

*W. Va. v. EPA*,
    142 S. Ct. 2587 (2022) ................................................... 31

*William Gas Processing-Gulf Coast, L.P. v. FERC,*
    475 F.3d 319 (D.C. Cir. 2006) ...................................................................... 34

*Wyoming v. United States,*
    279 F.3d 1214 (10th Cir. 2002) ................................................................... 37

*Ysleta Del Sur Pueblo v. Texas,*
    142 S. Ct. 1929 (2022) ................................................................................ 17

*Zzyym v. Pompeo,*
    958 F.3d 1014 (10th Cir. 2020) ................................................................... 34

## STATUTES

5 U.S.C. § 702 ....................................................................................... 44, 45

9 U.S.C. § 1 .............................................................................................. 16

16 U.S.C. § 433 ......................................................................................... 19

18 U.S.C. § 1866 .................................................................................... 5, 19

28 U.S.C. § 1291 ......................................................................................... 3

28 U.S.C. § 1331 ......................................................................................... 3

Antiquities Act of 1906, Pub L. No. 59-209, 34 Stat. 225 (1906)
    54 U.S.C. § 320301 ........................... 1, 4, 5, 13, 14, 16, 17, 18, 26, 29, 32, 43

Archaeological Resources Protection Act of 1979,
    16 U.S.C. § 470aa *et seq.* .......................................................................... 30

Eagle Protection Act,
    16 U.S.C. § 668 *et seq.* ............................................................................. 30

Endangered Species Act of 1973,
    16 U.S.C. § 1531 *et seq.* ........................................................................... 30

Federal Arbitration Act,
    9 U.S.C. §1 *et seq.* .................................................................................. 16

Federal Cave Resources Protection Act of 1988,
    16 U.S.C. § 4301 *et seq.* ........................................................................... 30

Federal Land Policy and Management Act,
    43 U.S.C. § 1710 *et seq.* ......................................................................... 6, 30

Migratory Bird Treaty Act,
16 U.S.C. § 703 *et seq.*........................................................................... 30

National Forest Management Act,
16 U.S.C. § 1600 *et seq.* ........................................................................ 30

National Historic Preservation Act,
54 U.S.C. § 300101 *et seq.* ..................................................................... 30

National Marine Sanctuaries Act,
16 U.S.C. § 1431 *et seq.* ......................................................................... 30

National Monuments Proclamation,
No. 1713, 43 Stat. 1968 (Oct. 15, 1924)................................................. 18

National Park Service Act,
54 U.S.C. § 100101 *et seq.* ..................................................................... 30

National Wild and Scenic Rivers Act,
16 U.S.C. § 1271 *et seq.* ......................................................................... 30

Native American Graves Protection and Repatriation Act of 1976,
25 U.S.C. § 3001 *et seq.* ......................................................................... 30

Paleontological Resources Preservation Act,
16 U.S.C. § 470aaa *et seq.* ..................................................................... 30

Wilderness Act,
16 U.S.C. § 1131 *et seq.* ......................................................................... 30

**OTHER AUTHORITIES**

40 Cong. Rec. 7888 (1906) ...............................................................21, 22

82 Fed. Reg. 58081 (Dec. 4, 2017) .......................................................... 8

82 Fed. Reg. 58089 (Dec. 4, 2017) .......................................................... 8

86 Fed. Reg 57321 (Oct. 8, 2021).................................................. 8, 9, 25, 29, 33

86 Fed. Reg. 57335 (Oct. 8, 2021)........................................ 8, 9, 25, 28, 29, 33

88 Fed. Reg. 17987 (Mar. 21, 2023) ...................................................... 27

88 Fed. Reg. 55331 (Aug. 8, 2023) ......................................................... 27

Black's Law Dictionary (2d ed. 1910) .................................................... 17

Fed. R. App. P. 28 ................................................................................... 46

Benjamin Hayes, CRS, *The Antiquities Act: History, Current Litigation, and*
*Considerations for the 116th Congress* (May 15, 2019) ........................ 4

H.R. 8066 (1900) ...................................................................................... 20

H.R. 10451 (1900) .................................................................................... 20

H.R. 11021 (1900) .................................................................................... 21

H.R. 13349 (1904) .................................................................................... 20

H.R. Rep. No. 58-3704 (1905) .................................................................... 4

H.R. Rep. No. 59-2224 (1906) ................................................... 5, 12, 21, 27

Ronald F. Lee, *The Antiquities Act of 1906* (1970) ........................ 3, 4, 20, 21

Letter from Harold L. Ickes, Sec'y of the Interior, to Hon. Rene L.
DeRoun, Chairman, House Comm. on Pub. Lands (Apr. 12, 1938),
*reproduced in* Report of the Committee on the Public Lands No. 2691
(June 10, 1938) .................................................................................. 17

NPS, *National Monument Facts and Figures* ............................................. 6

Frank Norris, *The Antiquities Act and the Acreage Debate*,
23 George Wright Forum 6 (2006) ...................................................... 26

Oxford English Dictionary (1909) ............................................................ 15

Justin J. Quigley, *Grand Staircase-Escalante National Monument:*
*Preservation or Politics*, 19 J. Land Res. & Env't L. 55 (1999) ............. 22

S. 4127 (1904) .......................................................................................... 20

S. Rep. No. 59-3798 (1906) ...................................................................... 21

Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*,
37 Ga. L. Rev. 473 (2003) ............................................................... 6, 22

USFWS, *Habitat Conservation Planning Handbook* G-14 (Dec. 21, 2016) ......... 29

Carol H. Vincent, CRS, *National Monuments and the Antiquities Act*
(Nov. 28, 2022) .................................................................................. 6

Webster's International Dictionary (1893) ................................................. 15

Webster's International Dictionary of the English Language (1902) ............ 18

Webster's New International Dictionary (1909)..........................................................15, 17

Webster's New International Dictionary (1913)..........................................................17, 18

## STATEMENT OF RELATED CASES

This appeal is related to and has been consolidated with *Garfield County, et al. v. Biden, et al.*. No. 23-4106 (10th Cir.).  There have been no prior appeals.

## INTRODUCTION

The Antiquities Act of 1906 "originated as a response to widespread defacement of Pueblo ruins in the American Southwest." *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980 (2021) (Roberts, C.J., statement respecting the denial of certiorari).  To that end, the Act gives the President the authority to proclaim as monuments "historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on [federal] land," and to set aside those lands that constitute the "smallest area compatible" with their protection.  54 U.S.C. § 320301(a)-(b).  And for much of its history, the Act has been interpreted according to its terms:  A tailored grant of power, where the President may reserve parcels of land to shield specific items.

No longer.  Invoking his Antiquities Act authority, President Biden recently set aside a landmass roughly the size of Connecticut—over *three million acres* of Southern Utah, roughly 5% of the State—as part of two monuments: Grand Staircase-Escalante and Bears Ears.  The President did so on the unprecedented rationale that entire *landscapes*—one 1.87 million acres (Grand Staircase-Escalante), the other 1.36 million acres (Bears Ears)—are "objects" under the statute.  So too an indeterminate collection of geographic areas, ecosystems, habitats, and even types of animals—from moths to minnows, shrimp to sheep.  "[H]ow far we have come from indigenous pottery," indeed. *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting denial).

The Proclamations are unlawful.  A landscape is not an "object situated on land." Nor is an ecosystem.  Or a falcon.  Worse still, the Proclamations do not simply exceed

1

the Antiquities Act's limits, but really seek to raze them.  Truly, if the President is free to deem all these things "objects," the Act would become boundless:  There is not an inch of federal land that is not part of some landscape, area, ecosystem, or habitat (or traversed by some animal).  All federal land would thus be fodder for a monument; the only restraint would be the President's discretion, which is no restraint at all.  And a carefully designed statute would be transformed "into a power without any discernible limit to set aside vast and amorphous expanses of terrain above and below the sea." *Id.*

The Government barely disputes this.  It instead keeps going:  On its view, the President's powers under the Antiquities Act are not just limitless, but unreviewable. As the Government would have it, the Act gives the President the unilateral authority to reserve *all* federal land on *any* ground he wants—anything from a sprawling landscape to a single bee—and sovereign immunity disables the federal courts from stopping him. But that assertion of plenary power is as lawless as it is breathtaking.  Since the Founding, it has been axiomatic that where an agent of the sovereign *lacks* the authority to act, the sovereign's immunity does not shield those *ultra vires* actions.  Every federal court to address the issue—until the court below—has thus held sovereign immunity does not bar suits like this one.  For good reason:  When the President goes beyond his authority, it is on the courts to stop him; the President does not operate in a law-free zone.

A few Terms ago, the Chief Justice emphasized that the time is well past due for the federal courts to start policing abuses of the Antiquities Act.  *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting denial).  For its part, the Government

2

invites the opposite—for the courts to step aside, avert their eyes, and issue a blank check. That is the choice before the Court now. And the proper course is clear: This Court must enforce the law Congress has written, and hold the Proclamations unlawful.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. § 1331. The district court entered final judgment on August 11, 2023. Add.30.[1] Plaintiffs noticed their timely appeal on August 16, 2023. 4-JA-998. 28 U.S.C. § 1291 confers jurisdiction.

## STATEMENT OF THE ISSUES

1.    Whether President Biden's proclamations on the Bears Ears and Grand Staircase-Escalante National Monuments exceed his authority under the Antiquities Act.

2.    Whether sovereign immunity bars review of such monument designations.

## STATEMENT OF THE CASE

### A.    The Antiquities Act.

In the late nineteenth century, Americans grew increasingly interested in the ruins and archeological treasures that interspersed the Western United States. *See* Ronald F. Lee, *The Antiquities Act of 1906* 21-28 (1970). But with interest came exploitation: With little regard for conservation, people tore through historic sites in hopes of finding objects of old to flip for a profit. *Id.* at 32. And at the time, federal law stood no barrier.

---

[1] Cites to the JA are to "Volume-JA-Page." Cites to the addendum are to "Add."

3

*See* Benjamin Hayes, CRS, *The Antiquities Act: History, Current Litigation, and Considerations for the 116th Congress* 2-3 (May 15, 2019) (describing the legal landscape).

The Antiquities Act emerged from an effort by archeologists to fill this legal void. Under banners like the Committee on the Protection and Preservation of Objects of Archaeological Interest, different groups of archaeologists proposed draft legislation that would (as their name might suggest) protect and preserve objects of archeological interest. *See* Lee, *supra*, at 47-77. Congress went back-and-forth on these antiquities bills for more than half a decade. *Id.*; *see also* Part I.A.3 *infra* (describing statutory history).

Eventually, Dr. Edgar Lee Hewett took the lead of what became the Antiquities Act of 1906. Hewett was already known in Congress, having taken Congressman Lacey—the influential Chairman of the House Public Lands Committee—around the Southwest to show him the "pueblos and cliff dwellings" that any proposed legislation would cover. Lee, *supra*, at 69. And he had worked with Congress to prepare a memorandum cataloguing "the historic and prehistoric ruins of Arizona, New Mexico, Colorado, and Utah" that would fall within the ambit of any law. H.R. Rep. No. 58-3704, at 2 (1905). At the end of 1905, Hewett submitted his bill to Congress, which the House and Senate soon passed, and which President Roosevelt soon signed. For all material purposes, the Antiquities Act of 1906 is the same as the Antiquities Act today (*compare* Pub L. No. 59-209, 34 Stat. 225 (1906)). And today, the Act reads as follows:

> **(a) Presidential declaration.—**The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and

4

other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments. 54 U.S.C. § 320301(a).

**(b) Reservation of land.—**The President may reserve parcels of land as a part of the national monuments. The limits of the parcels shall be confined to the smallest area compatible with the proper care and management of the objects to be protected. *Id.* § 320301(b).

Since 1906, the Antiquities Act has also always included its own punishment provision, which has criminalized the unlawful alteration of any feature of a monument:

**Appropriation of, injury to, or destruction of historic or prehistoric ruin or monument or object of antiquity.—**A person that appropriates, excavates, injures, or destroys any historic or prehistoric ruin or monument or any other object of antiquity that is situated on land owned or controlled by the Federal Government without [] permission … shall be imprisoned not more than 90 days, fined under this title, or both. 18 U.S.C. § 1866(b).

As discussed further below, Part I.A.3 *infra*, when the Antiquities Act was enacted, everyone understood exactly what the law did. To take one example, in the words of the House Report: The Act would empower the President "to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times." H.R. Rep. No. 59-2224, at 1.

Over time, Presidents have nonetheless taken an increasingly broad view of their Antiquities Act authority. Even still, country-sized monuments (like those here) are principally a modern phenomenon. *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting denial). "Since 2006," for instance, "Presidents have established

five marine monuments alone whose total area exceeds that of all other American monuments combined." *Id.* But such designations are outliers: Three-quarters of all monuments are under 100,000 acres; half, under 10,000 acres; and a third, 1,000 acres.[2]

The regulatory apparatus accompanying monument designations has grown, too. As it stands today, the "creation of a national monument is of no small consequence." *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting denial). Among much else, monument designations trigger an onerous regime of federal regulation— restrictions that flow from the proclamations themselves, as well as the implementing regulations that follow. *See* Carol H. Vincent, CRS, *National Monuments and the Antiquities Act*, at 8-10 (Nov. 28, 2022). And where, as here, the proclamation labels a monument the "dominant reservation" on the land, it displaces other policies—such as the flexible "multiple use" mandate that ordinarily applies to managing federal lands—and dictates how federal agencies must manage monument lands on a day-to-day basis. *See, e.g.*, 43 U.S.C. § 1732(a); *see also* Mark Squillace, *The Monumental Legacy of the Antiquities Act of 1906*, 37 Ga. L. Rev. 473, 514-19 (2003) (describing regulatory effects from designation).

Monuments are made by presidential proclamation alone. No public process is required; no congressional approval is needed; and no internal hurdles must be cleared.

---

[2] NPS, *National Monument Facts and Figures*, https://www.nps.gov/subjects/ archeology/national-monument-facts-and-figures.htm (last visited October 27, 2023).

**B.     Grand Staircase-Escalante and Bears Ears.**

The Grand Staircase-Escalante and Bears Ears National Monuments typify how Presidents have come to abuse the Antiquities Act.  Together, the Monuments span over *three million* acres in Southern Utah.  Each is over one million acres.  And each was deeply controversial—so much so that President Clinton announced Grand Staircase-Escalante in Arizona, and President Obama announced Bears Ears when leaving office.

President Clinton created Grand Staircase-Escalante in 1996, as part of an effort to shore up support from out-of-state environmentalists ahead of the election.  *See Utah Ass'n of Cntys. v. Bush*, 316 F. Supp. 2d 1172, 1181-82 (D. Utah 2004) (discussing context).  The original monument spanned 1.7 million acres in Kane and Garfield Counties.  And it came with a legion of regulations and restrictions that would hamper the region for decades.  *See, e.g.*, 1-JA-161-62 (describing serious harms to local communities).

The story of Bears Ears is of the same mold.  As with Grand Staircase-Escalante, Bears Ears pretermitted a robust debate among Congress, state officeholders, and local stakeholders as to how best protect this land.  *Id.* at 154-55 (collecting examples).  As with Grand Staircase-Escalante, the designation promised new restrictions that would upend traditions and existing ways of life across the area.  *Id.* (same).  And as with Grand Staircase-Escalante, the original monument covered over 1.3 million acres.

The opposition to Grand Staircase-Escalante endured, and the response to Bears Ears was severe.  So when President Trump took office, he pledged to reexamine both designations.  And in December 2017, he reduced the size of Grand Staircase-Escalante

by 860,000 acres, and Bears Ears by 1.2 million. 82 Fed. Reg. 58089, 58093 (Dec. 4, 2017); 82 Fed. Reg. 58081, 58085 (Dec. 4, 2017). For both, President Trump decided that many of the "objects" identified in each proclamation did not warrant protection under the Antiquities Act; that other federal laws were better suited to manage the lands at issue; and that the boundaries of the monuments were far larger than necessary. *Id.* at 58090-91; *id.* at 58081-82. Further, President Trump removed the bulk of restrictions that limited activities on remaining monument lands. *Id.* at 58093-94; *id.* at 58085-86.[3]

### C.    President Biden's Proclamations.

In his first year, President Biden reversed course, reinstating and expanding both Grand Staircase-Escalante and Bears Ears. 86 Fed. Reg. 57335 (Oct. 8, 2021); 86 Fed. Reg 57321 (Oct. 8, 2021). Under his proclamations (herein, the "Proclamations"), President Biden set aside 1.87 million acres for Grand Staircase-Escalante, and 1.36 million acres for Bears Ears. *Id.* at 57345; *id.* at 57332. Together, the Proclamations reserve an expanse of land two times the size of Delaware, carving off over 5% of Utah.

Foremost, President Biden justified each Monument on the ground that its entire landscape was *itself* an "object of historic and scientific interest," warranting protection under the Act. *Id.* at 57336; *id.* at 57322. Both Proclamations declare their respective

---

[3] Before President Trump revised the Grand Staircase-Escalante Monument, its borders were altered in minor part in three statutes. 86 Fed. Reg. at 57344. But none of these laws considered the validity of—much less codified—the Monument, versus tweaking its borders as part of other legislation. *See Utah Ass'n of Cntys. v. Bush*, 1999 U.S. Dist. LEXIS 15852, at *46-67 (D. Utah Aug. 12, 1999) (unpublished).

landscape *alone* justifies each monument *in full*. *Id.* at 57345; *id.* at 57331. This is entirely unprecedented: No President has *ever* claimed a landscape itself is an "object situated on land," let alone has tried to reserve millions of acres of federal land on that rationale.

More, the Proclamations also list a range of constitutive "objects" scattered over each landscape. Among them, both Proclamations state each landscape is broken into "distinct and unique areas, which are themselves objects qualifying for protection." *Id.* at 57338; *id.* at 57324. They also identify as "objects" a collection of "ecosystems" and "habitat[s]." *See, e.g.*, *id.* at 57323. So too a variety of animals—bees, owls, falcons, sheep, chuckwalla, and more. *See, e.g.*, *id.* at 57337. And the Proclamations use these amorphous and indeterminate items to independently justify each Monument's million-plus-acre borders, namely by filling the vast stretches of land separating the relics, ruins, and other valid "objects" that the Proclamations also identify. *Id.* at 57345; *id.* at 57331.

The Proclamations reinstate the Clinton- and Obama-era regulatory regimes for each Monument. *Id.* at 57344-46; *id.* at 57331-33. And they add some regulations of their own. *Id.* at 57346; *id.* at 57332. Both Proclamations have "warnings" as well—invoking the Act's punishment provision—that it is now illegal to "appropriate, injure, destroy or remove any feature of [each] monument" (*i.e.*, each landscape and everything in it). *Id.* at 57346; *id.* at 57333. Finally, both Proclamations direct the relevant federal agencies to develop management plans for each Monument—plans that will restrict and regulate all activity that is permitted on monument lands—which are due March 2024.

**D.    This Lawsuit.**

The point and purpose of the Proclamations was to reserve certain federal land from activities like ranching, mining, off-roading, and the like.  The Individual Plaintiffs are people whose lives and livelihoods depend on those very activities:  A rancher, a miner, an off-roading group, and a Native American seeking to remove traditional resources from monument lands.  So while the Individual Plaintiffs come from different backgrounds, they face a common peril from the Proclamations.

<u>Zeb Dalton:</u>  Zeb's family has been ranching in Southern Utah for generations, and he proudly follows in their footsteps, operating the TY Ranch in Blanding, Utah.  During the Trump Administration, less than 1% of Zeb's ranch was within the Bears Ears Monument; today, almost 75% of the ranch is on monument land.  This poses an existential threat to Zeb and the TY Ranch.  Operating on a national monument comes with tremendous regulatory burdens and compliance costs.  As one example, it is now much more difficult and expensive for Zeb to obtain permits for "range improvements" (*e.g.*, fences, wells, pipelines) that are necessary for him to operate his ranch.  If the Bears Ears Monument is allowed to stand in current form, Zeb is near certain that he will lose the ability to keep the ranch in business, and pass it along to his kids.  1-JA-282-97.

<u>Kyle Kimmerle:</u>  Kyle too is in the family business, and currently runs a mining company with his dad.  Kyle has a number of active mining claims within Bears Ears.  But now, given that they are located on monument lands, those claims are locked up and worthless.  More, even for the claims that Kyle would like to move forward on, the

fact they are now on monument lands subjects them to additional and costly regulations. For instance, Kyle must now pay hundreds of thousands of dollars for "validity exams," which are both expensive, and also risky—in particular, such exams expose the claims to being declared invalid (which BLM has told Kyle will happen). Due to the Proclamation, Kyle has already suffered $2-3 million in lost profits. *Id.* at 268-80.

BlueRibbon Coalition:  BlueRibbon is a non-profit that has been dedicated to preserving public access to public lands since 1987. It has thousands of members— both individuals and businesses, many of whom are in Utah—joined by a shared appreciation of the outdoors and, in particular, using off-road vehicles to explore them. The Proclamations harm both BlueRibbon as an organization, and also its membership. Among other things, the Proclamations have increased the regulatory burden for getting "special recreation permits" (*i.e.*, the permits required for hosting large group-rides or other events on public lands); caused areas to be closed to off-roading; shut off the prospect of new trails for future exploration and off-roading; and promised a legion of added closures and restrictions once the management plans are finalized. *Id.* at 203-66.

Suzette Morris:  Suzette is a member of the Ute Mountain Ute Tribe. Her family has roots tracing back generations in the lands that now make up Bears Ears. And these lands have deep religious and cultural significance for Suzette and her family. As part of those traditions, Suzette depends on having ready access to these lands so that she can remove certain resources from them (*e.g.*, cedar post, firewood, medicinal herbs). But following President Biden's Proclamation, Suzette has been deterred from doing

so, because the Proclamation warns it is now unlawful to alter any part of the Bears Ears landscape. And the same is true for others in her community. In short, due to the Proclamation, Suzette cannot practice her traditional "way of life." 2-JA-302-11.

In an effort to salvage their businesses, pastimes, and traditions, the Individual Plaintiffs filed this suit in August 2022. They sued both the President, and also those Executive Branch officials (and their agencies) charged with implementing the Proclamations. Plaintiffs principally sought declaratory and injunctive relief, holding the Proclamations unlawful, and barring their implementation or enforcement.

The district court consolidated this case with a similar suit filed by Utah, Kane County, and Garfield County. ECF 39. Afterwards, a number of parties sought to intervene on behalf of the Government—two of whom were successful, the Tribal-Intervenors and the SUWA-Intervenors. *See* ECF 52; ECF 122. The Defendants all moved to dismiss this suit in March 2023. ECF 113; ECF 114; ECF 141. The district court granted dismissal in August. Add.30. As discussed further below, the court held—for the first time—that presidential proclamations made under the Antiquities Act are categorically unreviewable, because of federal sovereign immunity. *Id.* at 15-19.

## SUMMARY OF ARGUMENT

I.     The Antiquities Act was enacted for a basic reason: To give the President the tailored ability "to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times." H.R. Rep. No. 59-2224, at 1. At bottom, this case turns on whether Congress failed at

that modest aim in spectacular fashion, and stumbled into vesting the President with plenary power to set aside any and all federal lands as a national monument. It did not.

The Act instead imposes deliberate limits on presidential power, consistent with its original focus. President Biden's Proclamations are irreconcilable with those limits—indeed, with the notion of limits at all. They purport to set aside over three million acres in Utah on the ground that landscapes, areas, ecosystems, habitats, and animals all constitute "objects of historic or scientific interest that are situated on [federal] land." 54 U.S.C. § 320301(a). But the text, structure, and history of the Act all confirm what common sense would compel: Those are not "objects" under the statute. Worse, if these justifications are allowed to stand, then the Antiquities Act will have no bound. There is not an inch of federal land that does not have such "objects."

Given that the Proclamations rest in whole and in part on invalid "objects," they are unlawful *in toto*. This Court should declare as much, thus barring their enforcement.

**II.**    Because both the Proclamations are in excess of the President's statutory authority, sovereign immunity does not bar this Court's review. It has been black-letter law since the Founding that when an officer acts in excess of his delegated power, those actions are the individual's, not the sovereign's. And accordingly, the officer's acts are not shielded by the sovereign's inherent immunity from suit. That is this case: The Proclamations set aside federal land on bases not authorized by the Antiquities Act; they are *ultra vires*, and thus reviewable. Regardless, the APA waives the Government's

13

sovereign immunity as to the subordinate federal officials charged with carrying out the unlawful Proclamations. Either way, sovereign immunity is no impediment to review.

## STANDARD OF REVIEW

This Court reviews *de novo* the dismissal of a complaint for failure to state a claim, including due to sovereign immunity. *Silva v. United States*, 45 F.4th 1134, 1137 (10th Cir. 2022); *Hennessey v. Univ. of Kansas Hospital Auth.*, 53 F.4th 516, 527 (10th Cir. 2022).

## ARGUMENT

### I. THE PROCLAMATIONS EXCEED THE PRESIDENT'S STATUTORY AUTHORITY UNDER THE ANTIQUITIES ACT .

Once more, in relevant part, the Antiquities Act reads as follows:

> **Presidential declaration.—**The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments. 54 U.S.C. § 320301(a).

This case concerns only the third set of items above—neither landmarks nor structures, but those "*other objects* of historic or scientific interest that are *situated on land* owned or controlled by the Federal Government*.*" Both Proclamations are exclusively justified as necessary to protect such "objects." In particular, President Biden issued the Proclamations to protect "objects" such as entire landscapes and geographic areas, as well as whole ecosystems and habitats (plus an ark's-worth of animals within them).

Those things are not "objects" in any sense, and they are certainly not "objects" under the plain terms of the Antiquities Act. More fundamental, the Proclamations not

only go beyond the Act's limits, but turn on rendering the Act limitless. If these Proclamations do not exceed the Act's bounds, none do—and none will. But that is not the statute that Congress has enacted, and this Court should enforce the one it did.

**A.    The Antiquities Act Confers a Limited Power.**

The Antiquities Act gives the President an important but still limited authority to reserve federal land in service of protecting certain items—among them, "objects of historic interest that are situated on [those] lands." Text, structure, and history all make plain an "object" is a discrete, material thing that can be visibly identified and is affixed to land. It is not an indefinite concept, whose content turns on the President's say-so.

**1.    Text.** At every turn, the Act's text reflects a confined reading of "object."

*First*, the word "object" itself imposes certain constraints. The Antiquities Act does not define "object," so the word has its ordinary meaning at the time of enactment. *See Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021). And uniformly, contemporary dictionaries defined an "object" as a discrete, material thing. *See, e.g.*, Webster's New International Dictionary, at 1482 (1909) ("That which is put or which may be regarded as put, in the way of some of the senses; something visible or tangible"); 10 Oxford English Dictionary, at 14 (1909) ("Something placed before the eyes, or presented in the sight or other sense; an individual thing seen or perceived … ; a material thing"); Webster's International Dictionary, at 990 (1893) (providing as examples: "he observed an *object* in the distance; all the *objects* in sight; he touched a strange *object* in the dark").

*Second*, the word "object" is delimited by the word "other."  The Act states the President may protect "historic landmarks, historic or prehistoric structures, and *other* objects of historic or scientific interest."  54 U.S.C. § 320301(a) (emphasis added).  In using the word "other," Congress made clear "objects of historic or scientific interest" should be read in light of "historic landmarks" and "historic and prehistoric structures." *See Tanzin v. Tanvir*, 141 S. Ct. 486, 490 (2020).  The use of "other" means an "object of historic or scientific interest" must be akin to an "historic landmark" or "historic or prehistoric structure."  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001).

This list also makes clear that, while an "object" must be *akin* to a historical landmark or structure, it should not *subsume* those items.  Here, the Supreme Court's approach to the Federal Arbitration Act—a different statue with a similar structure— is helpful.  The FAA does not apply to "contracts of employment of seamen, railroad employees, or any *other* class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1 (emphasis added).  As the Court has explained, "the phrase 'class of workers engaged in … commerce' should be 'controlled and defined by reference' to the specific classes of 'seamen' and 'railroad employees' that precede it."  *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022).  The alternative—reading the third category as picking up *all* employment contracts—would (among much else) write the first two out of the law.

The same logic holds here.  If "object" reduces to whatever the President deems worthy of protection, then "landmark" and "structure" are pointless.  But courts should

16

be loath to "ascrib[e] to one word a meaning so broad that it assumes the same meaning as another statutory term." *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022).

*Third*, "object" is modified by the phrase "situated on land owned or controlled by the Federal Government." That is, an "object" must be capable of being "situated on land." And at the time the Act was passed, "situated" meant "permanently fixed." *See, e.g.*, Webster's New International Dictionary, *supra*, at 1965 ("permanently fixed; located; as, a town *situated* on a hill"). Even the Government used to acknowledge this. As Secretary of Interior Harold Ickes once observed, the use of "situated" shows that "objects [must be] immobile and permanently affixed to the land."[4] And obviously, an amorphous concept (like a general habitat) or a living creature (such as a falcon) is not *affixed* to anything; only a discrete, material, stationary thing can be "situated on" land.

*Fourth*, "object" is modified further by the word "monument." The Act says that the President may declare certain "objects … to be national monuments." 54 U.S.C. § 3020301(a). A "monument," though, is a "building, pillar, stone, or the like, erected to preserve the remembrance of a person, event, action, etc." or "to indicate a limit or mark a boundary." Webster's New International Dictionary (1913); *see also, e.g.*, Black's Law Dictionary 791 (2d ed. 1910) (listing "posts, pillars, stone markers, cairns," as well as "fixed natural objects, blazed trees, and even a watercourse"). But something

---

[4] Letter from Harold L. Ickes, Sec'y of the Interior, to Hon. Rene L. DeRoun, Chairman, House Comm. on Pub. Lands (Apr. 12, 1938), *reproduced in* Report of the Committee on the Public Lands No. 2691 (June 10, 1938).

indeterminate or mobile cannot be a monument; nobody has ever been told to take a left at the ecosystem. Here too, only something discrete, material, and stationary works.

*Fifth*, the Act's title confirms a tailored reading of "object." It is the *Antiquities Act*—or in its longer form: "An Act For the preservation of American *antiquities*." Pub. L. No. 59-209, 34 Stat. 225 (emphases added). And at passage, an "antiquity" was "defined as a 'relic or monument of ancient times.'" *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980 (2021) (Roberts, C.J.) (statement respecting the denial of certiorari) (quoting Webster's International Dictionary of the English Language 66 (1902)); *see also* Webster's New International Dictionary (1913) (listing "coin" or "statue" as examples).

In short, every part of the text points the same way: The term "object" means something. And under its plain terms, an "object" (at minimum) means (i) a discrete, material thing, (ii) akin to a historic landmark or structure, that is (iii) affixed to the land.

**2.    Structure.** The structure of the Act confirms this understanding of the word "object." Indeed, it is the only definition that plugs back into the broader scheme.

The Antiquities Act has two main provisions that work in tandem: The first allows the President to designate certain items as monuments; the second allows him to reserve federal lands for their protection. But the latter is explicit that any reservation "shall be confined to the smallest area compatible with the proper care and management of the objects to be protected." 54 U.S.C. § 320301(b). So when President Coolidge made a monument of Fort Wood, for instance, he set aside its surrounding 2.5 acres for the structure's protection. *See* Proclamation No. 1713, 43 Stat. 1968 (Oct. 15, 1924).

18

As discussed more below, this "smallest area" provision was an indispensable part of the Act—without which it would not have become law. But an amorphous definition of "object" would render this provision meaningless, and unenforceable. If the contours of an "object" are not independently discernible, they will inevitably turn on whatever the President says; and the "smallest area compatible" with protecting that indeterminate "object" will *also* necessarily be whatever the President says. After all, if the President wants to set aside land to protect an "area" of his own creation, who is to say what is too big? Absent a concrete definition of "object," the "smallest area" provision would be a paper barrier—a thing to recite in a presidential proclamation, but no real limit on his power. There is no reason to read the Act in such a defeatist way.

The Act's remaining relevant provision—its punishment provision—is of a piece. Since its inception, the Act has included a *criminal* prohibition on appropriating, excavating, injuring, or destroying any aspect of a "monument" (including any "object of antiquity"). 18 U.S.C. § 1866(b) (current version); 16 U.S.C. § 433 (original). People have fair notice about what this proscribes only when an "object" can be readily discerned and quantified. They do not when a monument is only visible to its creator.

**3.    History.** The Antiquities Act's history tracks its text and structure. As touched on above, it took Congress over half a decade to enact this statute. And the product of that lengthy deliberation was not a blank check; it was a carefully tailored grant of authority. Two points in particular about the Act's history reaffirm this view.

*First*, the Antiquities Act's statutory history reveals a commitment by Congress to draft a circumscribed statute with defined limitations. Over this five-plus year span, Congress considered a number of proposals. *See* Lee, *supra*, at 47-77 (tracking history). But while these draft bills differed at the margins, they shared two core features: One, a desire to specify the particular *items* that could be protected;[5] and two, a commitment that the President could only employ the Act to set aside narrow bands of federal land.[6]

These considerations are most clear in the proposals Congress unambiguously *rejected*. The Interior Department had pushed bills that would give the President the unfettered ability to set aside whatever public land he wanted for virtually any reason—

---

[5] *Compare, e.g.*, H.R. 8066 (1900) (giving President power to designate as a park or reservation, among other things, "any prehistoric or primitive works, monuments, cliff dwellings, cave dwellings, cemeteries, graves, mounds, forts, or any other work of prehistoric or primitive man"); *with* H.R. 10451 (1900) (giving Secretary of Interior power to reserve narrow tracts to protect "monuments, cliff dwellings, cemeteries, graves, mounds, forts, or any other work of prehistoric, primitive, or aboriginal man"); *with* H.R. 13349 (1904) (covering "historic and prehistoric ruins, monuments, archaeological objects and other antiquities, and the work of the American aborigines on the public lands of the United States"); *with* S. 4127 (1904) (cataloging extensive list of specific fossils, relics, and ruins to be protected, like "mounds, pyramids, cemeteries, graves, tombs, and burial places and their contents, including human remains").

[6] *Compare, e.g.*, H.R. 8066, *supra* (limiting President's ability to set aside federal lands to only those "necessary for the proper preservation or suitable enjoyment of said reservation"); *with* H.R. 10451, *supra* (giving Secretary of Interior power to only reserve 320 acres at a time); *with* H.R. 13349, *supra* (placing covered objects in the custody of Secretary of Interior and giving him authority to grant excavation and collecting permits to qualified institutions); *with* S. 4127, *supra* (similar); *see also* Hayes, *supra*, at 4 (describing debates in Congress between setting strict fixed acre limit versus adopting more flexible standard such as "positively no more land … than is necessary for the purpose").

for instance, empowering him to reserve land in the name of "scenic beauty," "natural wonders," and other "curiosities." H.R. 11021 (1900). But Congress—led by members from Western States who wielded key votes, and who would only support a law that narrowly tailored any federal antiquity power—uniformly refused. Lee, *supra*, at 53-55.

*Second*, the contemporary reaction to the bill that became the Antiquities Act confirms that its original public meaning follows its plain text. To cut through earlier debates, Hewett's soon-to-succeed proposal adopted flexible yet cabined language: Rather than delineate each item to be protected, Hewett opted for three basic categories (*compare* note 5 *supra*); and rather than set a specific size limit for every monument, Hewett instead added the "smallest area compatible" provision (*compare* note 6 *supra*).

Importantly, as also touched on above, once Hewett's proposal became the Antiquities Act, everyone understood what the statue did. Again, as the House Report put it: "The bill proposes to create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times." H.R. Rep. No. 59-2224, at 1. Or in the words of the Senate Report: The Act was "carefully drawn" to protect "the historic and prehistoric ruins and monuments on the public lands of the United States [that] are rapidly being destroyed." S. Rep. No. 59-3798, at 1 (1906). And as Chairman Lacey stressed: The law was "meant to cover the cave dwellers and cliff dwellers," and its "object … is to preserve these old objects of special interest and the Indian remains in the pueblos of the Southwest, whilst [other legislation] reserves the forests and the water courses." 40 Cong. Rec. 7888 (1906). The

21

Act would not affect "very much [land]" because it "provides that it shall be the smallest area necessary for the care and maintenance of the objects to be preserved." *Id.*

On the other side, there was no suggestion—*none*—from any legislator, scholar, or commentator that the law bestowed on the President an open-ended authority. By contrast, there is a uniform consensus that Congress's intent was the exact opposite.[7]

**4.    Precedent.**  It bears note that even though the Antiquities Act has been on the books for over a century, the federal courts have generally said little about it. This Court has never opined on the scope of the Act.  And the Supreme Court has definitively spoken to the meaning of "object" just twice, yielding about three lines of independent analysis.  But those few lines offer dim light to analyze the issues presented here.  Indeed, as the Chief Justice confirmed, the Supreme Court has never *addressed*—

---

[7] *See, e.g., Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting denial) ("Because there was scarcely an ancient dwelling site in the area that had not been vandalized by pottery diggers for personal gain, the Act provided a mechanism for the preservation of prehistoric antiquities in the United States."); *Utah Ass'n of Cntys.*, 316 F. Supp. 2d at 1178 ("The original purpose of the proposed Act was to protect objects of antiquity."); *Utah Ass'n of Cntys. v. Clinton*, 1999 U.S. Dist. LEXIS 15852, at *10 (Congress "intended to limit the creation of national monuments to small land areas surrounding specific objects."); Squillace, 37 Ga. L. Rev. at 477-78 ("There seems little doubt that the impetus for the law that would eventually become the Antiquities Act was the desire of archaeologists to protect aboriginal objects and artifacts."); Justin J. Quigley, *Grand Staircase- Escalante National Monument: Preservation or Politics*, 19 J. Land Res. & Env't L. 55, 77 (1999) (covers "aboriginal antiquities situated on federal lands").

let alone *sanctioned*—a monument like Grand Staircase-Escalante or Bears Ears. *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting denial).[8]

The Court first engaged with the Antiquities Act in *Cameron v. United States*. While the case primarily turned on unrelated issues about Cameron's mining claim, it also touched on President Roosevelt's ability to designate the Grand Canyon National Monument. 252 U.S. 450, 454-56 (1920). The Court summarily rejected the argument he did not: "[The Canyon] is the greatest eroded canyon in the United States, if not in the world, is over a mile in depth, has attracted wide attention among explorers and scientists, affords an unexampled field for geologic study, is regarded as one of the great natural wonders, and annually draws to its borders thousands of visitors." *Id.* at 456.

This makes sense. The phrase "objects of historic or scientific interest that are situated on [federal] land" fairly includes natural formations, because such formations are (i) discrete, material things, (ii) akin to historic landmarks or structures, that are (iii) affixed to the land. Best read, *Cameron* simply confirms that the Antiquities Act's reference to "objects" is not necessarily limited to archeological sites and historic relics. But that is a far cry from saying that the word "object" has no limit at all, and can be stretched beyond all meaning to include amorphous concepts and indeterminate ideas.

---

[8] The D.C. Circuit is the only appellate court to have addressed the scope of the Act. And while it has rejected past challenges, it has never addressed the arguments pressed here. *See, e.g.*, *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535 (D.C. Cir. 2019).

The second (and only other) time the Court directly addressed the meaning of "object" was in *Cappaert v. United States*. There too, the case principally involved other issues (water rights); but it also included a challenge to the monument designation that protected the Devil's Hole subterranean pool. 426 U.S. 128, 141 (1976). In a line, the Court held the Act "g[ave] the President authority to reserve a pool," and that *Cameron* foreclosed petitioner's main argument the Act was limited to "archeological sites." *Id.*

The Court's rejection of a challenge to the "40-acre tract of land surrounding Devil's Hole" says nothing about the multi-million-acre monuments here. *Id.* at 131. There is little controversy that a natural pool—much like a backyard pool—can be an "object" under the above definition. *Cappaert* stands for nothing more, nothing less.[9]

In short, this Court is free to give the statute its best reading, and to enforce its terms as written. And as the text, structure, and history of the Act all make clear, when Congress gave the President the ability to set aside lands to protect certain "objects," it conferred upon him a limited grant of authority. An "object" is not in the eye of the beholder; it is not a boundless concept. Rather, an "object" must (at minimum) be (i) a discrete, material thing, (ii) akin to a historic landmark or structure, that is (iii) affixed

---

[9] It is true the *Cappaert* Court also mentioned the endemic species of fish that lived in the pool. *Id.* at 141-42. But it did so only as a reason *why* the pool was a worthy "object" under the Act. *Id.* at 142. The Court never analyzed whether animals could be "objects" under the Act. *See also United States v. California*, 436 U.S. 32, 34 n.5 (1978).

to the land.  The Antiquities Act does not give the President the statutory authority to turn federal land into a national monument in service of things that lack these features.

### B.    The Proclamations Exceed the Antiquities Act's Limits.

The Proclamations are based—in whole and in part—on protecting things that lack these features, and are not "objects" under the Act:  Landscapes, areas, ecosystems, habitats, and animals.  The Proclamations are thus in excess of the President's authority.

1.    **Land.**  The Proclamations rest foremost on the idea that land *itself* may constitute an "object situated on land."  The Grand Staircase-Escalante Proclamation sets aside *1.87 million acres* on the standalone rationale its entire landscape is an "object." 86 Fed. Reg. at 57336, 57345.  The Bears Ears Proclamation reserves *1.36 million acres* on the same basis.  *Id.* at 57322, 57331.  Moreover, both Proclamations declare that each landscape is composed of constitutive "areas" (*i.e.*, smaller landscapes) that are themselves protected "objects."  *Id.* at 57338 ("Within the whole are distinct and unique areas, which are themselves objects qualifying for protection."); *id.* at 57324 (similar).

This is unprecedented.  No President has ever declared a landscape itself as an "object."  And quite rightly.  This "land as object" theory is irreconcilable with the Act.

Start with the text.  An entire landscape—or the smaller "areas" within it—is not an "object" that is "situated on land."  It *is* the land.  An "object" placed *on* a shelf is not *the* shelf; an "object" set *on* a table is not *the* table; and an "object" situated *on* land is not *the* land.  That is no doubt why the Proclamations *omit* the Act's "situated on" language when identifying these parcels of land as "objects."  *See, e.g.*, *id.* at 57330-31.

25

Nor does a landscape or an area have the other necessary traits to be an "object." Something like a landscape is not a discrete, material thing. It is not akin to a historical structure. And it is certainly not akin to a *landmark* that (of course) *marks* the *land*. At day's end, the Government's "land as object" theory reduces the Act's key text to this:

> **Presidential declaration.—**The President may, in the President's discretion, declare by public proclamation ~~historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on~~ land owned or controlled by the Federal Government to be national monuments. 54 U.S.C. § 320301(a).

The "land as object" theory thus does not merely render a stray word or two superfluous; it vitiates the very essence of the statute. That is not sound interpretation.

The Government's theory fares no better once plugged back into the Act's structure. As noted, the second half of the Act mandates that any monument "shall be confined to the smallest area compatible" with the protection of its covered objects. 54 U.S.C. § 320301(b). But if the land *itself* can be the "object," this requirement would be meaningless. If the "area" and the "object" are the *same thing*, then the area will *necessarily* be the "smallest area compatible" with protecting that object—even if the size of Texas.

This Court should not countenance an interpretation of the Act that effectively excises one of its two core provisions. Again, the "smallest area compatible" provision was an essential piece of the original Antiquities Act, without which the statute would have never garnered enough Western votes to pass. Frank Norris, *The Antiquities Act and the Acreage Debate*, 23 George Wright Forum 6, 8 (2006). By intent and design, the

provision imposes a real limit on presidential power.  *Mass. Lobstermen's*, 141 S. Ct. at 981 (Roberts, C.J., statement respecting denial).  But under the "land as object" theory, presidents can circumvent that limit by just including the entire landmass of the desired monument within its list of "objects."  Indeed, President Biden has started to *do just that* with recent designations.  88 Fed. Reg. 55331, 55338 (Aug. 8, 2023) (setting aside nearly one million acres for Grand Canyon "landscape" and its objects); 88 Fed. Reg. 17987, 17993-94 (Mar. 21, 2023) (half million for Avi Kwa Ame "landscape" and its objects).

And of course, all of this would be unthinkable to the Congress that passed the Antiquities Act.  As explained, all agree that Congress intended the Act to empower the President to "create small reservations reserving only so much land as may be absolutely necessary for the preservation of these interesting relics of prehistoric times."  H.R. Rep. No. 59-2224, at 1.  True enough, statutes often go beyond their core focus.  And nobody is arguing that the phrase "object of historic or scientific interest" *only* means archeological relics, or some other term that is narrower than the plain words Congress used.  But the fundamental point remains that for the Government to be right, Congress must have passed a law that not only *exceeded* its primary goal, but in fact brought about the *very thing* it sought to avoid, and the *very thing* that it specifically rejected years prior— a blank check giving the President the power to set aside all federal land for any reason.  That is just not plausible.  And this Court should not lightly adopt a reading of a federal law premised on Congress, after a half-decade of debate, stumbling into such a blunder.

27

The Government's "land as object" theory—the theory which undergirds every single acre of the Proclamations—cannot square with any feature of the Act; not its text, not its structure, and not its history.  By contrast, every aspect of the statute confirms what ordinary sense would dictate:  Land is not an "object situated on land."

2. **The Other "Objects."**  Many of the other principal "objects' underlying the Proclamations fare no better.  None fits within the President's statutory authority.

Ecosystems.  The Proclamations each list sprawling "ecosystems" as "objects" warranting protection.  *See, e.g.*, 86 Fed. Reg. at 57340-41 (Grand Staircase-Escalante); 57323 (Bears Ears).  No competent speaker of English would characterize an ecosystem as an "object."  Nor is it one under the Antiquities Act.  An ecosystem is not a discrete, material thing; it is not akin to a historic landmark or structure; and it is surely not affixed to anything.  It is instead, in the words of the Chief Justice, an "imprecisely demarcated concept." *Mass. Lobstermen's*, 141 S. Ct. at 981 (statement respecting denial).

More, treating ecosystems as "objects" invites all the same abuses just described.  Because an ecosystem has no discernible bounds, the President can define it however he pleases, unrestrained by the "smallest area" provision.  Here too, the result would be an Act with no meaningful limit.  And this is not a hypothetical concern.  In recent litigation recently before the D.C. Circuit, the Government argued that the President could reserve all *three billion acres* along the Atlantic Ocean as a monument—just so long as he says it holds a single ecosystem.  Oral Argument at 21:22-22:42, *Mass. Lobstermen's Ass'n v. Ross*, 945 F.3d 535 (D.C. Cir. 2019) (No. 18-5353).  That cannot be right.

28

<u>Habitats.</u>  The same issues bedevil the many "habitats" that both Proclamations rely upon.  *See, e.g.*, 86 Fed. Reg. at 57341 (Grand Staircase-Escalante); *id.* at 57323 (Bears Ears).  But a habitat is simply "[t]he location where [an] animal lives and its surroundings."  USFWS, *Habitat Conservation Planning Handbook* G-14 (Dec. 21, 2016).  In other words, it *is* the land; and just like a landscape or an area, a habitat cannot be an "object" situated upon it.  A habitat also has no independently discernible bounds; so just like an ecosystem, treating it as an "object" cannot square with the Act's structure.

<u>Animals.</u>  Both Proclamations are replete with animals listed as "objects."  *See, e.g.*, 86 Fed. Reg. at 57339 (chuckwalla), 57342 (bees), 57342 (falcons), 57324 (sheep), 57328 (moths).  But an animal species is not an "object situated on federal land"—no different from a human, however historically or scientifically interesting he might be.

Most obvious, a living creature is not *affixed* to the land, let alone only *federal* land.  Likewise, while a living animal may be a discrete, material thing, it is nothing like the historic landmarks or structures that can be declared "national monuments" under the Act.  54 U.S.C. § 320301(a).  Indeed, it strains all sense to say that bees or falcons can be deemed "national monuments," akin to cave dwellings or some other fixed marker.  Perhaps unsurprising, in light of all this, even the Department of Justice itself used to recognize animals are not "objects."  *United States v. California*, 436 U.S. 32, 34 n.5 (1978).

## C.    The Government's Position Would Render the Act Limitless.

The repercussions of the Government's position only confirm its faults.  To save the Proclamations, the Government must transform the Antiquities Act into a law

without limit. Once more, if the above things are "objects," then any President would have the unilateral power to set aside any federal lands he wants for any reason: There is not an inch of land in this country that is not part of a landscape, area, ecosystem, or habitat (or is untouched by any animal). But Congress did not write such a blank check.

One telling sign the Antiquities Act is not so capacious is that reading the Act in such a way effectively annuls a host of other federal laws. Congress has enacted numerous laws for how the President "may preserve portions of land and sea." *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting denial). And it did so with detailed schemes that include deliberate procedures for the Executive to follow, such as with the Wilderness Act (16 U.S.C. § 1131 *et seq.*), the Federal Land Policy and Management Act (43 U.S.C. § 1710 *et seq.*), the National Park Service Act (54 U.S.C. § 100101 *et seq.*), and the National Marine Sanctuaries Act (16 U.S.C. § 1431 *et seq.*).[10]

But there is no reason for the President to bother with these hurdles or limits when he can accomplish the same ends with the stroke of a pen. Of course, the point is not that laws cannot overlap at all, or even overlap in significant ways. The point is

---

[10] *See, e.g.*, Archaeological Resources Protection Act of 1979, 16 U.S.C. § 470aa *et seq.*; National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.*; Bald and Golden Eagle Protection Act, 16 U.S.C. § 668 *et seq.*; Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.*; Federal Cave Resources Protection Act of 1988, 16 U.S.C. § 4301 *et seq.*; Migratory Bird Treaty Act, 16 U.S.C. § 703 *et seq.*; National Forest Management Act, 16 U.S.C. § 1600 *et seq.*; National Wild and Scenic Rivers Act, 16 U.S.C. § 1271 *et seq.*; Native American Graves Protection and Repatriation Act of 1976, 25 U.S.C. § 3001 *et seq.*; Paleontological Resources Preservation Act, 16 U.S.C. § 470aaa *et seq.*

that the Government's capacious reading of the Antiquities Act would render these other laws *nonsensical*. For instance, there is no reason the President would go through the cumbersome process for marine sanctuaries laid out by statute when he can simply declare a marine monument by diktat. It is also passing strange to think that Congress would keep for *itself* the power to create national parks—something it did expressly in the National Parks Act—only to give the President an easier way to effectively do the same thing. At bottom, reading "object" as "anything" vaults the Antiquities Act into tension with virtually every specific statutory scheme that covers similar subject matter; by contrast, giving "object" its ordinary meaning places the Act in harmony with them.

Of a piece, reading the Antiquities Act in such an open-ended manner collides not only with other schemes, but it also with common sense principles for how to read statutes. In particular, with the major questions doctrine—and its related canons—the Supreme Court has stressed that the federal courts should not read a law as resolving a matter of "economic and political significance," *W. Va. v. EPA*, 142 S. Ct. 2587, 2608 (2022), or upsetting the usual balance of "federal and state power" (especially if affecting "private property"), *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021), without clear text. This because it is "common sense" that Congress does not legislate big issues in subtle ways. *Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barret, J., concurring). It does not hide elephants in mouseholes, so the saying goes.

And it is equally unreasonable to think Congress would give the President the plenary power to set aside much of the West to protect a mousehole—*at least* without

saying so expressly.  Again, the "creation of a national monument is of no small consequence." *Mass. Lobstermen's*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting denial).  A monument carries the potential of curtailing all productive uses of federal land.  And given the fact the Government owns roughly half of the American West, that is no small deal; issues involving federal land management are intertwined with States' ability to function.  It is not surprising, then, that when Congress has addressed matters of land ownership in the West, it has spoken clearly by way of finely reticulated schemes—such as with the FLPMA.  And whatever the Antiquities Act is, it is not that.

Simply put, in using the phrase "other objects of historic or scientific interest," Congress did not vest the President with the unilateral power to set aside millions upon millions of acres of land for virtually any reason he pleases.  Among much else, common sense commands that if Congress were to do so, it really would have said something.

### D.    The Proclamations' Excesses Render Them Unlawful in Full.

The Proclamations are thus based—in whole and in part—on protecting things that are not "objects."  And these excesses render the Proclamations unlawful in full.  This follows from both the Antiquities Act itself, as well as settled remedial principles.

*First*, the statute.  The Antiquities Act provides that a monument is lawful *if and only if* it is the "smallest area compatible" for protecting its named "objects."  54 U.S.C. § 320301(b).  But here, given the many legal errors that pervade the Proclamations, both Monuments inescapably fail this requirement, and are thus invalid.  The Proclamations do not specify what lands are set aside for what objects; instead, they set aside three-

million-plus acres to protect one undifferentiated mass. As a matter of basic logic, once *part* of this mass is eliminated, the "smallest area" required to protect the *residuum* must be smaller too. If a judge drew up the "smallest" budget needed to hire four law clerks, it would of course be more than what the judge would need if he could only hire two.

This is all the more clear given how integral the above items are to both Proclamations. The Proclamations provide two justifications for their country-sized borders: One, each Monument is "independently" justified on the basis its underlying "landscape" is itself an "object in need of protection"; two, the constitutive "objects" scattered across each landscape also add up to three-million-plus acres of protection. *See, e.g.*, 86 Fed. Reg. at 57345 (Grand Staircase-Escalante); *id.* at 57331 (Bears Ears).

Both rationales depend heavily on legally invalid "objects." The "landscapes alone" rationale is based *entirely* on an invalid object. And the "constitutive objects" rationale is driven by the same. To start, separate and apart from landscapes, the Government relies on the same flawed "land as object" theory to support its second rationale. The Proclamations state that each landscape is a "nesting doll" of "distinct and unique areas, which are themselves objects qualifying for protection." *Id.* at 57338 (Grand Staircase-Escalante); *id.* at 57324 (Bears Ears). And those "areas" cover *every inch* of the monument designations. So whether by way of one big landscape or a group of smaller ones, the "land as object" theory undergirds the entirety of both Monuments.

The other purported "objects" only worsen the problem. The Proclamations identify around 100 species that traverse monument lands. Likewise, the Proclamations

33

rely on approximately 20 distinct habitats, and an indeterminate number of ecosystems. Taken on their own terms, the Proclamations rely on these mobile or amorphous items as gap-filling "objects" to justify the Monuments' massive scope, and to capture the vast expanses of federal land that exist between the identified ruins, artifacts, and fossils.

The basic point is this: As the Proclamations make plain, the above items had a material effect on the size and scope of each Monument. But because those items are not "objects," the Monuments' borders cannot be the "smallest area compatible" with protecting whatever valid "objects" exist within them. And because the Proclamations extend beyond this "smallest area," they are not lawful monuments under the statute.

*Second*, the same flows from settled remedial principles for executive action. It is black-letter law that when executive action is based on "multiple grounds … some of which are invalid," the federal courts "may only sustain the [action] where one is valid and the agency would clearly have acted on that ground even if the other were unavailable." *William Gas Processing-Gulf Coast, L.P. v. FERC*, 475 F.3d 319, 330 (D.C. Cir. 2006); *see also, e.g., Zzyym v. Pompeo*, 958 F.3d 1014, 1033-35 (10th Cir. 2020). That is not this case. At bare minimum, given the extent the Proclamations rely on invalid objects, there is a "significant chance" the President would have drawn different monuments without those items—and that is fatal under this Court's (and every courts') cases. *Nat'l Parks & Conservation Ass'n v. FAA*, 998 F.2d 1523, 1533 (10th Cir. 1993).

*Finally*, it makes no difference the Proclamations contain a severability clause, or happen to include some valid "objects" within them. The core reason why is that the

Proclamations do not specify what lands are set aside for what objects; so they fail to provide any judicial mechanism for a court to create smaller monuments that can salvage some subset of the Proclamations. Even if this Court were able to identify each and every valid "object" in the Monuments' current borders, it would have zero means of divining the "smallest area compatible" with protecting them. This is not to say that the President is under any legal obligation to show his work; but it is to say that if the President wants to create sprawling, state-sized omnibus monuments *without* showing his work, his creations may rise-and-fall on that decision. And here, the President has left this Court without any intelligible way—or for that matter, legal basis—to somehow "blue-pencil" these Monuments. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 509 (2010).

There is instead only one proper judicial remedy: Declare the Proclamations unlawful, and restore the status quo. *See, e.g.*, *Backcountry Hunters & Anglers v. U.S. Forest Serv.*, 612 F. App'x 934, 935 (10th Cir. 2015) (Gorsuch, J.). To the extent the President wishes to reserve additional lands through the Antiquities Act, it is his responsibility to designate a new monument that is properly tailored, and not in violation of the statute.

## II. SOVEREIGN IMMUNITY ACCORDINGLY DOES NOT BAR THIS SUIT.

The Proclamations are therefore in excess of the President's statutory authority, and unlawful root-to-branch. But according to the district court, the federal courts are powerless to do anything about them, because sovereign immunity precludes all review.

That was grievous error. No court has *ever* held that an Antiquities Act challenge was barred by sovereign immunity; rather, *every* federal court to address the argument

has rejected it.  And for good reason.  A claim grounded in the President exceeding his statutory authority is a quintessential *ultra vires* claim—and it has been understood since the Founding (and before) that when an agent of the sovereign acts *beyond* his delegated powers, he cannot cloak himself in the sovereign's inherent immunity.  Regardless, the APA waives sovereign immunity as to all of the federal officials who have been tasked with carrying out these illegal edicts.  Either way, sovereign immunity poses no bar here.

### A.    Sovereign Immunity Does Not Cloak Acts in Excess of Authority.

It is axiomatic that sovereign immunity does not attach when "government officials act beyond the limits of [their] statutory authority."  *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1232-33 (10th Cir. 2005).  That is this case:  In reserving federal lands for things that are not "objects" under the Antiquities Act, President Biden went beyond the limits of his authority.  In holding that this challenge is nonetheless barred by sovereign immunity, the district court misunderstood both the doctrine and the Act.

1.    Sovereign immunity does not apply where the officer *lacks* the authority to act.  The basic reason why is that when an agent of the sovereign acts without the sovereign's authorization, he is acting on his own; and unless wielding the sovereign's power, he cannot avail himself of the sovereign's immunity.  *See, e.g.*, *Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 714 (1982) (White, J., concurring in judgment in part and dissenting in part) ("[W]here the officer's actions are limited by statute, actions beyond those limitations are to be considered individual and not sovereign actions.").

36

For this reason, sovereign immunity does not attach when a federal officer either (i) acts in excess in his statutory authority, or (ii) acts pursuant to an unconstitutional statute (which is no law at all). *See, e.g.*, *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 701-02 (1949). Likewise, for state officers, a third situation applies: Given the Supremacy Clause, when a state actor violates federal law, sovereign immunity is also no barrier to suit. *See, e.g.*, *Verizon Md., Inc. v. Pub. Serv. Com'n of Md.*, 535 U.S. 635, 645 (2002) (discussing *Ex Parte Young* doctrine). In each event, the governmental actor *lacked* the power to act—either because he exceeded his statutory authority, or his authorizing statute conflicted with a higher law—and thus cannot cloak his actions in the sovereign's inherent immunity. Or in doctrinal shorthand, he was acting *ultra vires*.

The availability of judicial review of *ultra vires* action—notwithstanding sovereign immunity—predates the Republic. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015). It has been reaffirmed time and again (and again) by the Supreme Court. *See, e.g.*, *Dalton v. Specter*, 511 U.S. 462, 472 (1994) ("[S]overeign immunity [does] not shield an executive officer from suit if the officer acted … beyond his statutory powers."); *Int'l Primate Protection League v. Administrators of Tulane Educ. Fund*, 500 U.S. 72, 85-86 (1991) (an officer acts "*ultra vires*" when his "actions exceed[] the powers the sovereign had delegated to him"); *Dugan v. Rank*, 372 U.S. 609, 621 (1963) (sovereign immunity does not shield "action by officers beyond their statutory powers"). And it has been recognized time and again (and again) by this Court. *See, e.g.*, *Simmat*, 413 F.3d at 1232-33 (quoted above); *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002)

("[T]he general bar against suits seeking specific relief from the United States" does not apply if "the conduct is not within the officer's statutory powers."); *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 547 (10th Cir. 2001) (similar).

**2.**     This case fits that exception like a glove.  The essence of this suit is that President Biden went *beyond* his statutory authority under the Antiquities Act—which is limited to safeguarding "objects," properly understood—when he reserved federal land in the name of landscapes, areas, ecosystems, habitats, and animals.  That is what was alleged in the complaint.  *See, e.g.*, 1-JA-137, 147, 151, 155, 195-97.  It was what was argued below.  3-JA-737-44.  And it is a quintessential *ultra vires* claim, because it is a claim premised on the President doing something that he lacked the power to do.

Unsurprisingly, the only two federal appellate courts to encounter challenges like this one have flatly *rejected* any suggestion that sovereign immunity may bar review.  The D.C. Circuit has "consistently reviewed claims challenging national monument designations" when the claim was "that the President exceeded his authority under the Antiquities Act."  *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023) (collecting cases); *see also, e.g.*, *Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48, 55 (D.D.C. 2018) ("The Court can undoubtedly review these claims and decide whether the President acted within the bounds of his authority [under the Antiquities Act]."). This because when a governmental officer goes beyond the bounds of his statutory authority, sovereign immunity "never attached in the first place." *Chamber of Commerce*

*v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).  And that is as true for President as it is

for any of his subordinates.  *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996).

Applying these principles, the Ninth Circuit has also rejected any suggestion that

sovereign immunity bars *ultra vires* challenges to monument designations.  *Murphy Co. v.*

*Biden*, 65 F.4th 1122, 1129-31 (9th Cir. 2023).  By contrast, there are zero cases going

the other way:  As noted, no court has *ever* held sovereign immunity bars such actions.

> **3.**    In breaking new ground here, the district court seriously misapprehended

the doctrine.  According to the district court, because nobody doubts President Biden

has the statutory authority to declare *some* monument designations, he did not *lack* the

authority to declare the ones here.  Add.18.  At most, the argument goes, the President

"misused his authority," which is not enough to satisfy any *ultra vires* exception.  Add.19.

The fundamental mistake with this, however, is that it conflates an error in the

*exercise* of one's authority, with an official *exceeding* that authority.  Again, the touchstone

for sovereign immunity is whether the governmental actor lacked the authority for his

actions.  So the district court was right to recognize that an "error in the exercise" of

one's power is not enough; one can act *wrongly* while still acting *within* one's authority.

*Larson*, 337 U.S. at 688-90.  But going beyond the *scope* of one's authority is not erring

in in *exercise* of that authority.  It is exceeding delegated power; not wielding something

wrongly, but wielding something the governmental agent did not have in the first place.

The facts of *Larson*—the Supreme Court's canonical case on *ultra vires* review—

illustrates the distinction.  That case concerned a dispute over a coal contract:  Larson

claimed that he had purchased coal from the United States, and sought to enjoin the United States from selling that coal to someone else; the United States understood their prior contract to have been breached, and thus no longer in effect. 337 U.S. at 685. Most important, though, is that everyone agreed that the War Assets Administrator (the officer at issue) had the statutory authority to "refuse shipment in cases in which he believed the United States was not obliged to deliver." *Id.* at 691. Larson's argument instead was that the Administrator had *misused* his statutory powers—*i.e.*, that he exercised them in a way that ultimately violated substantive contract law. *Id.* at 691-92.

The Supreme Court held that Larson's claim was barred by sovereign immunity. This because using one's authority *wrongly* is different from *not having* that authority at all. Even if the Administrator had made an "incorrect decision as to law or fact"—even if he had used his powers in a way violative of the United States's prior contract with Larson—that did not mean he did not *have* the power to do what he did. *Id.* at 695. Put differently, it is possible for a federal law to authorize an unlawful action. *Id.* But so long as the Administrator was actually wielding a delegated power, his actions were covered by sovereign immunity, even if tortious or otherwise unlawful. *Id.* at 692-93.

The district court failed to grasp this distinction. When an official *exceeds* the bounds of his authority, that is not the sort of mere "error in the exercise of [his] power" that *Larson* held fell outside sovereign immunity. *Id.* at 690. Rather, when an official makes a mistake about the *scope* of his authority, and does something he is not in fact authorized to do, the actions are *ultra vires* and immunity does not attach. *Id.* at 701-02.

40

The district court, instead, collapsed all this, and essentially held that exceeding one's statutory authority is a subset of misusing that authority. On this view, so long as an official purports to wield his statutory authority—so long as he gestures toward a statute, and justifies his actions thereunder—sovereign immunity applies, because any such excess is just an error in application. Add.19. But that is plain wrong, both as a matter of common sense, and also if *ultra vires* review is going to exist at all. Every official will point to a source of law to justify his actions; but it is not up to the official to determine what that law means. Rather, when an official exceeds the bounds of his delegated power, his actions are no longer "actions of the sovereign," and are no longer shielded by the sovereign's immunity. 337 U.S. at 695. Here, for instance, if the President were to set aside *private lands* under the Antiquities Act, nobody would say that was just a "misuse" of his authority. So much so for items that are not "objects."

In short, while sovereign immunity may cloak how an official decides to use his actual authority, it does not permit the official to define the scope of his own authority. That is the job for the courts. *See, e.g.*, *Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 681 (1986) ("We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command."). And this Court should perform that role here. The President exceeded his authority in issuing the Proclamations. *See* Part I *supra*. And since he did so, sovereign immunity neither attaches nor bars review.

**4.** The district court also invoked *Dalton v. Specter*, although it is unclear how the decision factored into its sovereign immunity holding. Add.13-15. Regardless, the case gives the Government no help, and offers no quarter to these illegal Monuments.

To begin with, *Dalton* is not about sovereign immunity. It is about the availability of nonstatutory review for presidential actions—*i.e.*, the availability (essentially) of a cause of action in equity. It is wrong to "confuse[] the doctrine of sovereign immunity with the requirement that a plaintiff state a cause of action." *Larson*, 337 U.S. at 692-93. While both concern a court's ability to hear a case, they are strictly distinct concepts.

No matter, even on its own terms, *Dalton* has no bearing here. The federal courts have long recognized that equity may provide a cause of action for "when government officials act beyond the limits of statutory authority." *Simmat*, 413 F.3d at 1233. And that is true for the President as much as any other federal official. *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 703 (1997). In *Dalton*, the Supreme Court carved out an exception to this longstanding rule for when a law commits a decision to the President's discretion. Specifically, in *Dalton*, the statute charged the President with making a "discrete specific decision" (whether to close a suggested military base), but gave "no limitations on the President's exercise of that authority." *Reich*, 74 F.3d at 1331 (describing doctrine). The *Dalton* Court held nonstatutory review was not available in such a case. 511 U.S. at 476.

*Dalton* stands for the proposition that where a statute imposes no limits "at all" on the President's discretion, a federal court cannot use its equitable authority to review that discretionary act. *Id.* This because—absent any statutory criteria, or guidance from

some other legal source—there is really no law to apply in such circumstance. And basic separation-of-powers principles reject the notion that the Judiciary can subject such purely discretionary actions to some floating "abuse of discretion" standard, where the federal courts would replace the President's judgment for theirs. *See id.* at 475-76.[11]

But that is not this case. The Antiquities Act imposes concrete limits on the President's discretion. He may only declare monuments to protect certain items; and must restrict any monument to the smallest area compatible with their protection. *See* 54 U.S.C. § 320301. When the President goes beyond those limits, he is not *abusing* the discretion available to him; he is *exceeding* the fixed legal limits on his power. And that is why here too, the D.C. Circuit has regularly held that nonstatutory review is available for Antiquities Act cases like this one, "to ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority." *Mountain States Legal Found v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002).

All told, while the Antiquities Act may give the President sole discretion over *whether* to declare a monument at all, it does not give him the unreviewable discretion

---

[11] The other cases culminating in *Dalton* all fit this pattern, where a statue assigned the President a discrete decision, but provided no limits on the exercise of his discretion. *See Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 114 (1948); *United States v. George S. Bush & Co.*, 310 U.S. 371, 379-80 (1940); *Dakota Cent. Tel. Co. v. S.D. ex rel. Payne*, 250 U.S. 163, 181, 184 (1919); *see also Dalton*, 511 U.S. at 478 (Blackmun, J., concurring in part and concurring in the judgment) (underscoring that decision did not affect availability of "*ultra vires*" review for executive actions in excess of statutory limits).

to determine for himself *what* the Act authorizes.  Rather, because the Act imposes

genuine limits on his authority, *Dalton* poses no bar to this Court checking his excesses.[12]

### B.     The APA Independently Waives Sovereign Immunity.

Section 702 of the APA "generally waives the Federal Government's immunity

from a suit" for "non-monetary relief" against all "official[s]" other than the President.

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012);

*see also* 5 U.S.C. § 702.[13]  And this waiver is not limited to claims arising under the APA.

*Simmat*, 413 F.3d at 1233.  Accordingly, *even if* sovereign immunity somehow attached

to this suit, § 702 waives it for every federal defendant here other than the President.

This flows right from the statute.  The complaints in this case are only seeking

non-monetary relief.  The other federal defendants—the various officials charged with

implementing the Proclamations—are all executive officials.  And if the Proclamations

---

[12] In citing *Dalton*, the district court also emphasized this case involves statutory
rather than constitutional challenges.  But for sovereign immunity purposes, it is unclear
why that matters.  The issue is whether the official *lacked* authority for his actions.  And
as explained, that can either be because he exceeded the bounds of his authority, or
he acted under an unconstitutional statute (which is no law at all).  There is nothing special
to constitutional claims, except one cannot have authority to violate the Constitution.

[13] Section 702 reads: "An action in a court of the United States seeking relief
other than money damages and stating a claim that an agency or an officer or employee
thereof acted or failed to act in an official capacity or under color of legal authority shall
not be dismissed nor relief therein be denied on the ground that it is against the United
States or that the United States is an indispensable party."  The President's actions are
not themselves subject to this waiver, because he is neither an "agency" nor an "officer
or employee thereof."  *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 981 n.4 (D.C. Cir. 1996).

are unlawful, then any of the defendants' actions implementing them "under color of legal authority" are unlawful too. 5 U.S.C. § 702; *see also Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188-89 (1999). Put together, for the non-presidential federal defendants, the Government waived its immunity under a plain reading of § 702.

The district court avoided this straightforward result on the ground that the President was the "lone official connected to the Proclamations." Add.16. In other words, because the President is not subject to the APA, nothing related to his direct actions—be it a monument designation, or executive order—is subject to § 702. *Id.*

But that is not what § 702 says, and it is not the law. While the APA does not waive sovereign immunity for claims *against* the President, it is well-settled that "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to *enforce* the President's directive." *Franklin v. Massachusetts*, 505 U.S. 788, 828-29 (1992) (Scalia, J., concurring in part and concurring in the judgment) (emphasis added); *see also, e.g.*, *Brnovich v. Biden*, 562 F. Supp. 3d 123, 150 & n.16 (D. Ariz. 2022) (§ 702 waives immunity for those implementing executive order). Put otherwise, while § 702 carves out *the President*, it does not immunize all of *his actions*. Instead, the statute's plain text waives sovereign immunity for suits against an "agency or an officer or employee thereof" that has "acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. That covers every federal defendant here who has been tasked with carrying out President Biden's unlawful Proclamations.

## CONCLUSION

For the above reasons, this Court should reverse the district court's judgment.[14]

Dated:  October 30, 2023

Respectfully submitted,

*/s/ Brett A. Shumate*

James M. Burnham
KING STREET LEGAL, PLLC
800 Connecticut Ave., N.W., Ste. 300
Washington, D.C. 20006
Telephone: (602) 501-5469
james@kingstlegal.com

Brett A. Shumate
Harry S. Graver
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
bshumate@jonesday.com

Brady Brammer
BRAMMER RANCK, LLP
1955 W. Grove Parkway, Ste. 200
Pleasant Grove, UT 84062
Telephone: (801) 893-3951
bbrammer@brfirm.com

*Counsel for Individual Plaintiffs*

---

[14] Pursuant to FRAP 28(i), the Individual Plaintiffs hereby adopt by reference Parts II.B and III of the State Plaintiffs' brief.

## REQUEST FOR ORAL ARGUMENT

The Individual Plaintiffs respectfully request oral argument. This appeal raises important questions about the scope of the Antiquities Act, the reach of the Federal Government's sovereign immunity, and the reviewability of presidential action. The Individual Plaintiffs thus respectfully submit that oral argument will help the Court analyze and resolve these issues.

Dated: October 30, 2023                    Respectfully submitted,

                                           */s/ Brett A. Shumate*
                                           Brett A. Shumate

## **<u>CERTIFICATE OF COMPLIANCE</u>**

This brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,955 words, excluding the parts of the brief exempted by Rule 32(f) and 10 Cir. R. 32(B), as counted using the word-count function on Microsoft Word 2016 software.

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Garamond style, 14-point font.

Dated: October 30, 2023

Respectfully submitted,

*/s/ Brett A. Shumate*
Brett A. Shumate

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that with respect to the foregoing Brief of Individual Plaintiffs: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Safety Scanner—version 1.399.1404.0, updated October 27, 2023, and according to the program are free of viruses.

Dated: October 30, 2023                    Respectfully submitted,

*/s/ Brett A. Shumate*
Brett A. Shumate

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2023, I electronically filed the original of the foregoing Brief of Individual Plaintiffs with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

Dated: October 30, 2023          Respectfully submitted,

*/s/ Brett A. Shumate*
Brett A. Shumate

# ADDENDUM

## TABLE OF CONTENTS

| ECF No. | DESCRIPTION | DATE FILED | PAGE |
|---------|-------------|------------|------|
| 180 | Memorandum & Order Granting Motions to Dismiss | Aug. 11, 2023 | Add. 1 |
| 181 | Judgment Dismissing Case with Prejudice | Aug. 11, 2023 | Add. 29 |

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| GARFIELD COUNTY, UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES; *Plaintiffs*, | **MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS, dkt no. 113, and MOTION TO DISMISS, dkt no. 114** |
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS; *Consolidated Plaintiffs*, | Case No. 4:22-cv-00059-DN-PK  District Judge David Nuffer  Magistrate Judge Paul Kohler |
| v. | |
| JOSEPH R. BIDEN, JR. in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; TOM VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; FOREST SERVICE; *Defendants*, | |
| HOPI TRIBE, NAVAJO NATION, PUEBLO OF ZUNI, and UTE MOUNTAIN UTE TRIBE; *Intervenor-Defendants,* | |
| SOUTHERN UTAH WILDERNESS ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY, GRAND CANYON TRUST, GREAT OLD BROADS FOR WILDERNESS, NATIONAL PARKS CONSERVATION ASSOCIATION, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, WESTERN WATERSHEDS PROJECT, and WILDEARTH GUARDIANS. *Intervenor-Defendants*. | |

# CONTENTS

CONTENTS.................................................................................................................. 2
BACKGROUND ........................................................................................................ 2
  Introduction............................................................................................................. 2
  Procedural History ................................................................................................. 4
  The Antiquities Act ................................................................................................ 7
  The Bears Ears and Grand Staircase-Escalante National Monuments ............................. 9
STANDARD OF REVIEW ...................................................................................... 12
DISCUSSION ........................................................................................................... 12
  Judicial review of these two Proclamations is not permitted without a waiver of sovereign immunity...................................................................................................... 13
    Plaintiffs' claims are statutory challenges, not constitutional challenges............. 13
    President Biden's actions are not within the *ultra vires* exception to sovereign immunity..................................................................................................... 17
  The Memoranda are not "final agency action" reviewable under the APA .................... 19
    The Memoranda do not meet the three requirements for "final agency action"... 21
  Individual Plaintiffs do not have standing to bring the claim for denial of permits ......... 26
CONCLUSION.......................................................................................................... 28
ORDER ..................................................................................................................... 28

# BACKGROUND

## Introduction

"The creation of a national monument is of no small consequence."[1] When President
Jimmy Carter withdrew 56 million acres in Alaska to be national monuments in 1978,[2] Alaskans
protested and broke "over 25 Park Service rules in a two-day period."[3] Utahns protested when
President Clinton withdrew the Grand Staircase-Escalante National Monument. The signing
ceremony took place at the South Rim of the Grand Canyon, Arizona "[t]o avoid protests that
would mar a photo opportunity."[4] "[S]olemn and angry," Kanab, Utah residents wore black arm

---

[1] *Mass. Lobstermen's Ass'n v. Raimondo*, 141 S. Ct. 979, 980 (2021) (Roberts, C.J., statement respecting cert denial).

[2] Proclamation Nos. 4611-4627, 3 C.F.R. 69-104 (1978 Comp.).

[3] *Sturgeon v. Frost*, 577 U.S. 424, 430 (2016).

[4] *New Reserve Stirs Animosities in Utah*, N.Y. Times, Oct. 13, 1996.

**Add. 2**

bands, released 50 black balloons, and bore signs saying, "Shame on you Clinton."[5] Northeast-based commercial fishing associations sued federal officials for "injury from the restrictions on commercial fishing" imposed by the Northeast Canyons and Seamounts Marine National Monument.[6] That monument is "an area roughly the size of Connecticut that sits 130 miles off the coast of Cape Cod."[7] In 2020, the University of Hawaii and the Pacific Islands Fisheries Science Center published their results of the economic impact of Papahānaumokuākea Marine National Monument.[8] President Bush proclaimed the monument, 139,793 square miles, in 2006[9] and President Obama expanded it to 442,781 square miles in 2016,[10] resulting in millions of dollars of lost fishing revenue in the first sixteen months after the expansion.[11]

"The President's unique status under the Constitution distinguishes him from other executive officials,"[12] causing him to have "unreviewable Presidential discretion."[13] Chief Justice Roberts recognized "[t]he broad authority that the Antiquities Act vests in the President stands in marked contrast to other, more restrictive means" used to "preserve portions of land and sea."[14] He also pointed out that the Antiquities Act "has been transformed into a power

---

[5] *1996: Clinton Takes a 1.7 million-acre Stand in Utah*, High Country News, Sep. 30, 1996; *see Strong Emotions Reignited on 20th Anniversary of Utah Monument*, CBS News, Sep. 18, 2016.

[6] *Massachusetts Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48, 53 (D.D.C. 2018), *aff'd as modified*, 945 F.3d 535 (D.C. Cir. 2019).

[7] *Obama Creates Atlantic Ocean's First Marine Monument*, N.Y. Times, Sep. 15, 2016.

[8] Hing Ling Chan, *Economic Impacts of Papahānaumokuākea Marine National Monument Expansion on the Hawaii Longline Fishery*, Marine Policy, Vol. 115 (2020).

[9] Proclamation No. 8031, 71 Fed. Reg. 36441, 36444 (June 2006).

[10] Proclamation No. 9478, 81 Fed. Reg. 60227, 60230 (Aug. 2016).

[11] Chan, *Economic Impacts* at 12.

[12] *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

[13] *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 113 (1948).

[14] *Raimondo*, 141 S. Ct. at 980 (Roberts, C.J., statement respecting cert denial).

Add. 3

without any discernible limit to set aside vast and amorphous expanses of terrain above and below the sea."[15]

"How the President chooses to exercise the discretion Congress has granted him is not a matter for [a court's] review."[16] Instead, according to the 9th Circuit, "[w]hen Congress has wished to restrict the President's Antiquities Act authority, it has done so expressly."[17] Twice, Congress has responded when a president has withdrawn land as a national monument. President Franklin D. Roosevelt proclaimed the Jackson Hole National Monument, 221,610 acres,[18] on March 15, 1943.[19] In 1950, Congress aggressively responded, amending the Antiquities Act itself to prohibit "further extension or establishment of national monuments in Wyoming…except by express authorization of Congress."[20] And later, in response to President Carter's 1978 Alaska proclamations, Congress passed a law that prohibited "future executive branch action which withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska."[21] Congress knows how to restrict statutory presidential power. Otherwise, the terms of the statute control.

### Procedural History

This action stems from two cases:

> Consolidated Plaintiffs against President Biden, the Secretary of the Interior, the Director of the Bureau of Land Management, the Secretary of Agriculture, the Chief of the Forest Service, the Department of the Interior, the Bureau of Land

---

[15] *Id.* at 981.

[16] *Dalton v. Specter*, 511 U.S. 462, 476 (1994).

[17] *Murphy Co. v. Biden*, 65 F.4th 1122, 1132 (9th Cir. 2023).

[18] *Id.*

[19] Ronald F. Lee, *The Antiquities Act of 1906: The Proclamation of National Monuments Under the Antiquities Act, 1906-1970*, Article 8, US Department of the Interior, National Park Service (1970).

[20] 54 U.S.C. § 320301(d) ("Limitation on Extension or Establishment of National Monuments in Wyoming").

[21] Act of Dec. 2, 1980, Pub. L. No. 96-487, § 1326(a), 94 Stat. 2371, 2488.

Management, the Department of Agriculture, and the Forest Service ("Federal Defendants");[22] and

Plaintiffs ("Utah Plaintiffs") against Federal Defendants.[23] Federal Defendants filed an unopposed motion to consolidate[24] which was granted.[25]

Intervenor-Defendants Tribal Nations ("Tribal Nations") filed a motion to intervene as defendants,[26] which was granted soon after the cases were consolidated.[27]

Additional organizations requested to be added as defendants,[28] but only the Southern Utah Wilderness Alliance and affiliates[29]("SUWA Intervenors") were permitted to intervene.[30] Other motions to intervene await final decision, pending entry of this order.[31]

Consolidated Plaintiffs[32] and Utah Plaintiffs[33] (collectively "Plaintiffs") filed separate amended complaints. They collectively allege:

---

[22] Civil Docket, case no. 4:22-cv-00060, Complaint filed Aug. 25, 2022.

[23] Civil Docket, case no. 4:22-cv-00059, Complaint filed Aug. 24, 2022.

[24] Unopposed Motion to Consolidate Civil Cases 4:22-cv-59 and 4:22-cv-60, docket no 25, filed Nov. 16, 2022.

[25] Order Granting Motion to Consolidate Cases, docket no. 39, filed Nov. 30, 2022; Order for Consolidation, case no. 4:22-cv-000060, docket no. 63, filed Nov. 30, 2022.

[26] Proposed Intervenors' Second Amended Rule 24 Motion to Intervene, docket no. 29, filed Nov 22, 2022.

[27] Order Granting Movants Hopi Tribe, Navajo Nation, Pueblo of Zuni, and Ute Mountain Ute Tribe's Amended Motion to Intervene, docket no. 52, filed Dec. 8, 2022.

[28] Motion to Intervene and Memorandum in Support, docket no. 27, filed Nov. 22, 2022; Rule 24 Motion of Grand Staircase Escalante Partners, Society of Vertebrate Paleontology, and Conservation Lands Foundations to Intervene as Defendants, docket no. 31, filed Nov. 23, 2022; Motion to Intervene Under Rule 24 and Memorandum of Law in Support of Utah Diné Bikéyah, Friends of Cedar Mesa, The Society of Vertebrate Paleontology Archaeology Southwest, Conservations Lands Foundation, Inc., Patagonia Works, The Access Fund, and The National Trust for Historic Preservation in the United States, docket no. 33, filed Nov. 23, 2022; Motion to Intervene as Defendants and Memorandum in Support, docket no. 34, filed Nov. 23, 2022.

[29] Motion to Intervene and Memorandum in Support 1 n.2 ("Movants are Southern Utah Wilderness Alliance, Center for Biological Diversity, Grand Canyon Trust, Great Old Broads for Wilderness, National Parks Conservation Association, Natural Resources Defense Council, Sierra Club, The Wilderness Society, Western Watersheds Project, and WildEarth Guardians.").

[30] Memorandum Decision and Order on Proposed Intervenors' Motions to Intervene 2, docket no. 122, filed March 17, 2023.

[31] Memorandum Decision and Order Staying Decision on UDB Intervenors' Objection, GSEP Intervenors' Objection, Archaeological Intervenors' Objection and Plaintiffs' Objection 4-5, docket no. 176, filed July 7, 2023.

[32] Amended Complaint for Declaratory and Injunctive Relief ("Amended Complaint 90"), docket no. 90, filed Jan. 26, 2023.

Add. 5

(1) President Biden violated the Antiquities Act ("the Act") with the Bears Ears National Monument Proclamation[34] and the Grand Staircase-Escalante National Monument Proclamation[35] (collectively "Proclamations"); and

(2) all Federal Defendant agencies are adversely affecting Plaintiffs through

> (a) the Bears Ears National Monument and Grand Staircase-Escalante National Monument interim memoranda[36] ("the Memoranda") which Plaintiffs allege are "final agency actions,"[37] and

> (b) the denial of permits, which Plaintiffs also allege are "final agency actions."[38]

Plaintiffs seek (1) a declaration that the Act does not authorize President Biden's Proclamations and that they "are therefore unlawful, unenforceable, and void"[39]; (2) "an injunction forbidding Defendants and their successors from implementing, administering, or enforcing" the Proclamations;[40] and (3) a declaration that the alleged final agency actions by Defendants are unlawful.[41]

Federal Defendants,[42] Tribal Nations,[43] (collectively "Defendants") and SUWA Intervenors[44] filed separate motions to dismiss. The National Wildlife Federation filed an *amicus*

---

[33] Amended Complaint of Garfield County, Kane County, and The State of Utah ("Amended Complaint 91"), docket no. 91, filed Jan. 26, 2023.

[34] Amended Complaint 90, ¶¶ 180, 183; Amended Complaint 91, ¶ 373.

[35] Amended Complaint 90, ¶¶ 180, 183; Amended Complaint 91, ¶ 380.

[36] Amended Complaint 90, ¶ 191; Amended Complaint 91, ¶¶388, 391, 396, 399.

[37] Amended Complaint 90, ¶ 192; Amended Complaint 91, ¶¶ 386, 394.

[38] Amended Complaint 90, ¶ 193.

[39] Amended Complaint 90 at 66; *see* Amended Complaint 91 at 95.

[40] *Id.*

[41] *Id.*

[42] Defendants' Motion to Dismiss Amended Complaints, docket no. 113, filed March 2, 2023.

[43] Hopi Tribe, Navajo Nation, Pueblo of Zuni, and Ute Mountain Ute Tribe Motion to Dismiss, docket no. 114, filed March 2, 2023.

*curiae* brief in support of these motions.[45] The motions were fully briefed.[46] The Separation of Powers Clinic filed an *amicus curiae* brief in support of Plaintiffs' arguments.[47]

Consolidated Plaintiffs filed a motion for summary judgment soon after the motions to dismiss were filed.[48] Defendants motion to stay briefing on the motion for summary judgment pending disposition of this motion[49] was granted.[50]

For reasons stated below, Federal Defendants' and Tribal Nations' motions to dismiss are GRANTED and the case is DISMISSED with prejudice.

## The Antiquities Act

Enacted in 1906, the Antiquities Act "was the first U.S. law to provide general legal protection of cultural and natural resources of historic or scientific interest on Federal lands."[51] Ten years later, the National Parks System was created "to conserve the scenery, natural and historic objects, and wildlife in the System units and to provide for the enjoyment of the scenery,

---

[44] SUWA Intervenors' Motion to Dismiss Amended Complaints and Memorandum in Support, docket no. 141, filed March 30, 2023.

[45] Brief of Proposed *Amicus Curiae* National Wildlife Federation, Utah Wildlife Federation, New Mexico Wildlife Federation, Arizona Wildlife Federation, and Colorado Wildlife Federation in Support of Intervenor-Defendants' and Federal Defendants' Motions to Dismiss, docket no 124, filed March 20, 2023.

[46] Individual Plaintiffs' Opposition to Motions to Dismiss, docket no 153, filed April 14, 2023; Garfield County Plaintiffs' Opposition to Motions to Dismiss, docket no 154, filed April 14, 2023; SUWA Intervenors' Reply in Support of Motion to Dismiss, docket no 164, filed May 5, 2023; Hopi Tribe, Navajo Nation, Pueblo of Zuni, and Ute Mountain Utah Tribe Reply in Support of Motion to Dismiss, docket no 165, filed May 5, 2023; Defendants' Reply in Support of Motion to Dismiss Amended Complaints, docket no. 166, filed May 5, 2023.

[47] Brief of Proposed *Amicus Curiae* Separation of Powers Clinic, docket no. 161, filed April 27, 2023.

[48] Individual Plaintiffs' Motion for Summary Judgment, docket no 117, filed March 9, 2023.

[49] Defendants' Motion to Stay Summary Judgment Briefing or, Alternatively, to Extend Deadline for Filing Response to Summary Judgment Motion, docket no. 129, filed March 24, 2023; Hopi Tribe, Navajo Nation, Pueblo of Zuni, and Ute Mountain Ute Tribe Motion to Stay Summary Judgment Briefing or to Extend Deadline for Fling Response to Motion for Summary Judgment, docket no. 138, filed March 27, 2023; SUWA Intervenors' Motion to Stay Summary Judgment Briefing, and to Incorporate SUWA Intervenors' Motion to Dismiss into Existing Briefing Schedule, docket no. 142, filed March 30, 2023.

[50] Memorandum Decision and Order Granting Defendants' Motion to Stay, Intervenor-Defendants Tribal Nations' Motion to Stay and SUWA Intervenor-Defendants' Motion to Stay, docket no. 149, filed April 4, 2023.

[51] *Statement for the Record*, Designation of Monuments Pursuant to the Authorities Provided in the Antiquities Act.

natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."[52]

The process for a President to establish or enlarge a national monument under the Antiquities Act is two-fold. "The President may, in the President's discretion, declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated on land owned or controlled by the Federal Government to be national monuments."[53] Then the President "may reserve[s] parcels of land as a part of the national monuments."[54] These parcels "shall be confined to the smallest area compatible with the proper care and management of the objects to be protected."[55]

Since 1920, there have been several challenges to a president's authority to withdraw land as a national monument under the Antiquities Act. These include challenges to the Grand Canyon,[56] Jackson Hole,[57] Devil's Hole,[58] Grand Sequoia,[59] Grand Canyon-Parashant, Canyons of the Ancients, Cascade-Siskiyou, Hanford Reach, Ironwood Forest, Sonoran Desert,[60] Grand Staircase-Escalante,[61] and Northeast Canyons and Seamounts Marine[62] national monuments. Each of these challenges has been unsuccessful.

---

[52] 54 U.S.C.A. § 100101.

[53] 54 U.S.C. § 320301(a).

[54] *Id.* at § 320301(b).

[55] *Id.*

[56] *Cameron v. United States,* 252 U.S. 450 (1920).

[57] *State of Wyoming v. Franke*, 58 F. Supp. 890 (D. Wyo. 1945).

[58] *Cappaert v. United States,* 426 U.S. 128 (1976).

[59] *Tulare Cnty. v. Bush*, 306 F.3d 1138 (D.C. Cir. 2002).

[60] *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1133-34(D.C. Cir. 2002).

[61] *Utah Ass'n of Ctys. v. Bush*, 316 F. Supp. 2d 1172, 1176 (D. Utah 2004) *appeal dismissed Utah Ass'n of Ctys. v. Bush*, 455 F.3d 1094, 1096 (10th Cir. 2006).

[62] *Massachusetts Lobstermen's Ass'n v. Ross*, 945 F.3d 535 (D.C. Cir. 2019) (cert. denied *Massachusetts Lobstermen's Ass'n v. Raimondo*, 209 L. Ed. 2d 486 (2021)).

**The Bears Ears and Grand Staircase-Escalante National Monuments**

The Grand Staircase-Escalante National Monument ("GSENM") was established on September 18, 1996 by President Clinton with Proclamation 6920.[63] It then "consist[ed] of approximately 1.7 million acres."[64] President Trump reduced the monument to 1,003,863 acres on December 4, 2017.[65] President Biden enlarged the monument to 1.87 million acres on October 8, 2021.[66]

The Bears Ears National Monument ("BENM") was established on December 28, 2016, by President Obama with Proclamation 9558.[67] It consisted of "approximately 1.35 million acres."[68] President Trump reduced the monument to 201,876 acres.[69] President Biden enlarged the monument to 1.36 million acres on October 8, 2021.[70]

---

[63] Proclamation No. 6920, 3 C.F.R. 64 (Sep. 18, 1997).

[64] Proclamation No. 6920 at 67.

[65] Proclamation No. 9682, 82 Fed. Reg. 58089, 58093 (Dec. 4, 2017).

[66] Proclamation No. 10286, 86 Fed. Reg. 57335, 57345 (Oct. 8, 2021).

[67] Proclamation No. 9558, 82 Fed. Reg 1139 (Dec. 28, 2016).

[68] Proclamation No. 9558 at 1143.

[69] Proclamation No. 9681, 82 Fed. Reg. 58081, 58085 (Dec. 4, 2017).

[70] Proclamation No. 10285, 86 Fed. Reg 57321, 57331 (Oct. 8, 2021).



Grand Staircase-Escalante National Monument image: Exhibit H, docket no. 113-9, filed March 2, 2023.



Bears Ears National Monument image: Exhibit G, docket no. 113-8, filed March 2, 2023.

## STANDARD OF REVIEW

Defendants bring their Motion to Dismiss under Fed. R. Civ. P. 12.[71] "[T]o withstand a motion to dismiss, a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'"[72] Dismissal is appropriate under Rule 12(b)(6) when the complaint, standing alone, is legally insufficient to state a claim on which relief may be granted.[73] Each cause of action must be supported by enough sufficient, well-pleaded facts to be plausible on its face.[74] In reviewing a complaint on a Rule 12(b)(6) motion to dismiss, factual allegations are accepted as true and reasonable inferences are drawn in a light most favorable to the plaintiff.[75] However, "assertions devoid of factual allegations" that are nothing more than "conclusory," and "formulaic recitation" of the law are disregarded.[76]

## DISCUSSION

"Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts."[77]

This rule bars Plaintiffs' claims. Plaintiffs allege President Biden exceeded his authority by enlarging the GSENM and BENM via the Proclamations. Before deciding if the Proclamations are unlawful, the court must decide if they can be reviewed by a court. They cannot. Judicial review requires a waiver of sovereign immunity, which is not present.

---

[71] Defendants' Motion to Dismiss Amended Complaints 1; Tribal Nations' Motion to Dismiss 1.

[72] *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[73] Fed. R. Civ. P. 12(b)(6); *see Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

[74] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[75] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[76] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009).

[77] *Martin v. Mott*, 25 U.S. 19, 31–32 (1827).

**Add. 12**

Plaintiffs also allege that the Memoranda written by the Bureau of Land Management ("the BLM") constitute "final agency action" according to the Administrative Procedures Act. They do not. And Plaintiffs do not have standing to allege a denial of a permit because they were not harmed.

### Judicial review of these two Proclamations is not permitted without a waiver of sovereign immunity

Plaintiffs allege that President Biden's Proclamations are reviewable by a federal district court.[78] "The United States, as sovereign, is immune from suit save as it consents to be sued."[79] "The government consents to be sued only when Congress unequivocally expresses its intention to waive the government's sovereign immunity in the statutory text."[80] Without a statutory waiver by Congress, judicial review of a president's actions is only permitted for constitutional challenges[81] and *ultra vires* challenges.[82] Without either of those bases, "[judicial] review is not available when the statute in question commits the decision to the discretion of the President."[83]

### Plaintiffs' claims are statutory challenges, not constitutional challenges

Plaintiffs allege that President Biden violated the Act by enlarging the BENM and GSENM with the Proclamations. These are statutory—not constitutional—claims, similar to those in *Dalton v. Specter*.[84] In that case, the President had recently received the authority to close a Philadelphia naval shipyard "pursuant to the Defense Base Closure and Realignment Act

---

[78] Individual Plaintiffs' Opposition to Motions to Dismiss 9-15; Utah Plaintiffs' Opposition to Motions to Dismiss 61.

[79] *United States v. Sherwood*, 312 U.S. 584, 586, 61 S. Ct. 767, 769, 85 L. Ed. 1058 (1941).

[80] *United States v. Murdock Mach. & Eng'g Co. of Utah*, 81 F.3d 922, 930 (10th Cir. 1996) (internal quotations omitted).

[81] *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

[82] *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

[83] *Dalton*, 511 U.S.462, 474 (1994).

[84] *Id.*

of 1990 (1990 Act or Act)."[85] "The decision to close the shipyard was the end result of an elaborate selection process prescribed by the 1990 Act."[86] "[T]he Act provide[d] for three successive rounds of base closings—in 1991, 1993, and 1995."[87] "For each round," the Secretary of Defense ("Secretary") "prepare[d] closure and realignment recommendations," and "submit[ted] his recommendations to Congress and to the Defense Base Closure and Realignment Commission (Commission)."[88] The Commission conducted its own review and issued its recommendations and report.[89] After receiving the Commission's report, the President was required to "decide whether to approve or disapprove" the recommendations.[90] If the President approved the recommendations, "the President must submit the recommendations…to Congress."[91] If Congress did not pass a joint resolution of disapproval, "the Secretary must close all military installations recommended for closure by the Commission."[92] Respondents— "shipyard employees and their unions; Members of Congress from Pennsylvania and New Jersey; the States of Pennsylvania, New Jersey, and Delaware, and officials of those States; and the city of Philadelphia"[93]—"sought to enjoin the [Secretary] from carrying out" the President's decision.[94] Respondents filed their action under the Administrative Procedure Act ("the APA") and the 1990 Act, alleging the Commission's recommendations were faulty.[95] The Supreme

---

[85] *Id*. at 464 (parenthetical in original).

[86] *Id*. at 464.

[87] *Id*. at 464-65.

[88] *Id*. at 465 (parenthetical in original).

[89] *Id*. at 465.

[90] *Id*.

[91] *Id*.

[92] *Id*.

[93] *Id*. at 464 n.1.

[94] *Id*. at 464.

[95] *Id.* at 466.

Add. 14

Court held that the claims were statutory because the President was "said to have violated the terms of the 1990 Act by accepting procedurally flawed recommendations."[96] The claims in this case are also statutory. President Biden is accused of violating the Antiquities Act with his Proclamations that enlarge GSENM and BENM. The claims target the President's actions under the statute. Therefore, they are statutory claims, and judicial review is unavailable.

A "President's actions may…be reviewed for constitutionality."[97] Plaintiffs did not make any constitutional challenges in their amended complaints.[98]

**§702 of the APA does not waive sovereign immunity**

Rather than making constitutional challenges, Plaintiffs argue that § 702 of the APA waives the Federal Government's sovereign immunity.[99] § 702 of the APA states "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

Individual Plaintiffs assert "[s]ection 702 has been read to operate as a 'general waiver' of federal sovereign immunity for all injunctive or declaratory relief."[100] Individual Plaintiffs assert that the Proclamations "necessarily must be implemented by executive branch subordinates" and therefore "claims concerning such proclamations are inherently premised on stopping unlawful subordinate executive action."[101]

Their argument stems from *Brnovich v. Biden*, a District of Arizona case involving vaccination requirements relating to federal contractors and subcontractors ("the Contractor

---

[96] *Id.* at 474.

[97] *Franklin*, 505 U.S. at 801.

[98] *See* Amended Complaint 90 ¶¶ 179-96; Amended Complaint 91 ¶¶ 370-99.

[99] Individual Plaintiffs' Opposition to Motions to Dismiss 12; Utah Plaintiffs' Opposition to Motions to Dismiss 61.

[100] Individual Plaintiffs' Opposition to Motions to Dismiss 12 (citing to *U.S. v. Murdock Mach. & Eng'g Co.*, 81 F.3d 922, 929 n.8 (10th Cir. 1996)).

[101] *Id.*

**Add. 15**

Mandate.")[102] The district court explained that the mandate "involve[d] a substantial number of officials and entities within the executive apparatus that are unquestionably subject to this Court's equitable jurisdiction." [103] And that court concluded that "Plaintiffs' claims implicat[ing] presidential action" "[did] not preclude judicial review"[104] of the actions of the subordinate officials and entities.

*Brnovich v. Biden* does not apply to this case. Individual Plaintiffs' amended complaint identifies only the President—and not any other Defendant—as the lone official connected to the Proclamations. The complaint's claims include: "President Biden's proclamations"[105]; "President Biden's reservation of land"[106]; "the President lacks the power to declare a reservation that covers the affected area"[107]; "the President's discretion"[108]; "the [Antiquities] Act gives the President the limited power"[109]; "every President's proclamations must comply with the [Antiquities] Act"[110]; and "the President has exceeded his authority."[111] As Individual Plaintiffs' amended complaint points out, there are no intermediary officials involved in the issuance of the Proclamations. Their arguments attempt to sidestep the reality that the President is the one

---

[102] *Brnovich v. Biden*, 562 F. Supp. 3d 123, 132-33 (D. Ariz. 2022) (*reversed on other grounds Mayes v. Biden*, 67 F.4th 921 (9th Cir. 2023).

[103] *Id.* at 150.

[104] *Id.*

[105] Amended Complaint 90 ¶¶ 180-83; Amended Complaint 91 ¶¶ 373, 380.

[106] Amended Complaint 91 ¶¶ 374, 381.

[107] *Id.* at ¶¶ 376, 383.

[108] *Id.*

[109] Amended Complaint 90 ¶ 180.

[110] Amended Complaint 91¶¶ 375, 382.

[111] *Id.* at ¶¶ 371, 378.

Add. 16

"vest[ed]…with authority to administer the [Antiquities] Act and manage the [Proclamations]."[112]

Utah Plaintiffs do not fare any better. They allege "the APA waives sovereign immunity for *all* non-damages actions against the federal government."[113] They reference a Tenth Circuit case, *Simmat v. U.S. Bureau of Prisons*. [114] But this case actually said, "Congress passed legislation in 1976 to waive sovereign immunity in most suits for nonmonetary relief."[115] Utah Plaintiffs fail to acknowledge the *Franklin v. Massachusetts* ruling by the Supreme Court in 1992, which distinguished the APA term "agency" from "the President." The Supreme Court held that "[t]he President is not an agency within the meaning of the [APA]."[116] "As the APA does not expressly allow review of the President's actions," "his actions are not subject to its requirements" nor "reviewable for abuse of discretion under the APA."[117] Therefore, Utah Plaintiffs' argument fails.

**President Biden's actions are not within the *ultra vires* exception to sovereign immunity**

Plaintiffs allege that the Proclamations are *ultra vires* President Biden's authority.[118] An exception to the sovereign immunity doctrine is "suits for specific relief" when an "officer is not doing the business which the sovereign has empowered him to do" and "[h]is actions are *ultra vires* his authority."[119] This exception is narrow, available "only because of the officer's lack of

---

[112] *Wyoming v. United States*, 279 F.3d 1214, 1228 (10th Cir. 2002).

[113] Utah Plaintiffs' Opposition to Motions to Dismiss at 61.

[114] 413 F.3d 1225 (10th Cir. 2005).

[115] *Id.* at 1233.

[116] *Franklin*, 505 U.S. at 796.

[117] *Id.* at 801.

[118] Amended Complaint 91 ¶¶ 371, 378; Individual Plaintiffs' Opposition to Motions to Dismiss 11-12; Utah Plaintiffs' Opposition to Motions to Dismiss 60-62.

[119] *Larson*, 337 U.S. at 689.

**Add. 17**

delegated power."[120] Merely an "error in the exercise of that power is therefore not sufficient"[121] to satisfy the exception. Invoking *ultra vires* is an "attempt to avoid the shield of sovereign immunity."[122]

Plaintiffs' amended complaint does not assert that President Biden lacks the authority to withdraw federal land as national monuments.

Individual Plaintiffs declare in their opposition that "the President went *beyond the bounds* of his authority to wield a power he does not possess and declare as 'objects' things the Antiquities Act categorically does not reach."[123] And their opposition argues that "this suit rests on the President's *lack* of authority to fashion these monuments."[124] However, Individual Plaintiffs do not cite to any claims from their amended complaint to support these allegations. Even if Individual Plaintiffs were granted leave to amend their complaint, they would not be able to plead the *ultra vires* exception. "No court of appeals has addressed…how to interpret the [Act's] 'smallest area compatible' requirement." At most, Individual Plaintiffs would be able to make the same arguments Utah Plaintiffs make, *infra*. But without additional guidance from Congress or a higher court, the President's actions are not *ultra vires*.

Utah Plaintiffs declare in their opposition that they "allege over and over (in their amended complaint) that the President had no power to make the reservations because they 'exceed [the] limitations] of the Antiquities Act."[125] They cite to paragraphs 288-318 of their amended complaint for support. But those factual statements are allegations that President Biden

---

[120] *Id.* at 690.

[121] *Id.*

[122] *State of N.M. v. Regan*, 745 F.2d 1318, 1320 n.1 (10th Cir. 1984).

[123] Individual Plaintiffs' Opposition to Motions to Dismiss 11-12 (emphasis in briefing).

[124] *Id*. at 12 (emphasis in briefing).

[125] Utah Plaintiffs' Opposition to Motions to Dismiss 61.

misused his authority, not that he lacked it. They claim he exceeded the limitations of the Act[126] by declaring things as monuments "that are not qualifying landmarks, structures, or objects under the Act."[127] They allege his designations are too generic.[128] For example, "items are listed as categories, such as 'broad desert mesas,' rather than as specific objects, such as 'Dance Hall Rock.'"[129] They allege that only nine items[130] "qualif[y] for monument designation under the Act."[131] And while their first two claims for relief are "lack of statutory authority under Antiquities Act," their amended complaint does not contain allegations that President Biden lacked the authority to designate federal land as the BENM and the GSENM.

Plaintiffs cannot rely on the *ultra vires* exception.

### The Memoranda are not "final agency action" reviewable under the APA

On December 16, 2021, the director of the BLM issued Memoranda to the Utah State Director for the BLM.[132] One addressed the BENM Proclamation No. 10,285[133] and the other, the GSENM Proclamation No. 10,286.[134] The subject of each was "Interim Management of the [National Monument]."[135] The Memoranda claim to "(a) provide[] interim guidance for managing the monument while the agency develops a monument management plan; and (b)

---

[126] Amended Complaint 91 at 68.

[127] *Id.* at 61; ¶¶ 293-98, 302-05, 311-313.

[128] *Id.* at ¶¶ 299-301, 306-310.

[129] *Id.* at ¶ 299.

[130] *Id.* at ¶¶ 322-23 ("Bears Ears Buttes, Butler Wash Village, Doll House, Moon House, Newspaper Rock, and San Juan Hill"; "Dance Hall Rock, Twentymile Wash Dinosaur Megatrackway, and Grosvenor Arch").

[131] Amended Complaint 91 ¶ 314.

[132] Memorandum from the BLM Director to the BLM Utah State Director re: Interim Mgmt. of the Bears Ears Nat'l Monument (Dec. 16, 2021) ("BENM Memorandum"); Memorandum from the BLM Director to the BLM Utah State Director re: Interim Mgmt. of the Grand Staircase-Escalante Nat'l Monument (Dec. 16, 2021) ("GSNM Memorandum").

[133] BENM Memorandum.

[134] GSNM Memorandum.

[135] BENM Memorandum 1; GSNM Memorandum 1.

direct[] [the BLM Utah State Director] to begin preparing a monument management plan, with a goal of finalizing that plan no later than March 1, 2024."[136]

Plaintiffs allege that the Memoranda should be reviewed because they are considered "final agency action" under § 706(2) of the APA.[137]

As stated *supra*, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[138] "[T]he person claiming a right to sue must identify some 'agency action' that affects him in the specified fashion."[139] "Agency action" "ha[s] the meaning[] given [it] by [5 U.S.C. §551]."[140] "'[A]gency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."[141] "[A]ction…is meant to cover comprehensively every manner in which an agency may exercise its power."[142]

Agency action must be by statute or final agency action.[143] "[F]inal agency action for which there is no other adequate remedy in a court are subject to judicial review."[144] "Final agency action" is not defined in the US Code.

---

[136] *Id.*

[137] Amended Complaint 90 ¶¶ 190-96; Amended Complaint 91 ¶¶ 385-99.

[138] 5 U.S.C. § 702.

[139] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990).

[140] 5 U.S.C. §701(b)(2).

[141] *Id.* at § 551(13).

[142] *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 478 (2001).

[143] 5 U.S.C. § 704.

[144] *Id.*

Add. 20

**The Memoranda do not meet the three requirements for "final agency action"**

To determine if agency action is final depends on (1) whether its impact on a plaintiff is "direct and immediate"[145]; (2) whether the action "mark[s] the consummation of the agency's decisionmaking (sic) process"[146]; and (3) whether the action is "one by which rights or obligations have been determined, or from which legal consequences will flow."[147] The Memoranda—almost identical to one another in text—(1) do not have a direct and immediate impact on Plaintiffs; (2) are not the end of the BLM's decision making process; and (3) do not establish rights, obligations, nor legal consequences.

*(1)    The Memoranda do not have a direct and immediate impact on Plaintiffs*

In order to have a direct and immediate impact on a plaintiff, an agency action must "purport to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of all [plaintiffs]."[148] An example is given in *Abbott Laboratories v. Gardner*. The Commissioner of Food and Drugs published a regulation[149] that, "effective immediately upon publication,"[150] required "labels, advertisements, and other printed matter relating to prescription drugs to designate the established name of the particular drug involved

---

[145] *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 152 (1967) (*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

[146] *Bennett v. Spear,* 520 U.S. 154, 178 (1997) (internal quotations omitted).

[147] *Id.*

[148] *Abbott Lab'ys*, 387 U.S. at 152.

[149] *Id.* at 138 ("'If the label or labeling of a prescription drug bears a proprietary name or designation for the drug or any ingredient thereof, the established name, if such there be, corresponding to such proprietary name or designation, shall accompany each appearance of such proprietary name or designation.' 21 CFR s 1.104(g)(1).").

[150] *Id.* at 152.

**Add. 21**

every time its trade name [was] used anywhere in such material."[151] This necessitated "destroy[ing] stocks of printed matter" and "invest[ing] heavily in new printing type and new supplies."[152] If plaintiffs—"a group of 37 individual drug manufacturers and…the Pharmaceutical Manufacturers Association"[153]—chose not to comply, they "would risk serious criminal and civil penalties for the unlawful distribution of 'misbranded' drugs."[154] That consequence was direct and immediate impact.

The Memoranda do not have a direct and immediate impact on Plaintiffs. Plaintiffs assert that the Memoranda "restrain [their] use of the land, cut off potential revenue, and impede other projects."[155] And that "[they] have been subjected to new rules, regulations, restrictions, and standards imposed and caused by both interim management plans."[156] However, the contents of the Memoranda do not support these allegations.

The Memoranda are directed to the BLM's Utah State Director[157] ("BLM-UT"), and the BLM-UT is the only person given directives in the Memoranda.[158] The Memoranda only mention State and local governments and citizens for consultation purposes. The Memoranda "direct[] the Secretary of the Interior and the Secretary of Agriculture" to "coordinat[e] with State and local governments" "in the development of the monument management plan."[159] They advise that "[t]he planning process should…provide for maximum public involvement, including

---

[151] *Id.* at 139.

[152] *Id.* at 152.

[153] *Id.* at 138.

[154] *Id.* at 153.

[155] Amended Complaint 91 ¶¶ 388, 396.

[156] Amended Complaint 90 ¶ 192.

[157] BENM Memorandum 1; GSENM Memorandum 1.

[158] BENM Memorandum 2-8; GSENM Memorandum 2-7.

[159] BENM Memorandum 6; GSENM Memorandum 6.

consultation with State and local governments, community members, and other interested

stakeholders."[160] And the Proclamations require the monument advisory committees "to include

representatives from 'State and local governments, Tribal Nations, recreational users,

conservation organizations, educators, local business owners, private landowners, and the

scientific community."[161] No action of any Plaintiff is compelled by the Memoranda. There are

no immediate deadlines for Plaintiffs in the Memoranda; only the deadlines for a BLM planning

process: "within one year"[162]; 6 months[163]; within 45 days[164]; and "expeditiously (by January 31,

2022)."[165] Nothing in the Memoranda's language directly or immediately impacts Plaintiffs.

>    (2)    *The Memoranda are not a consummation of the BLM's decision making process*

Plaintiffs' claim that the Memoranda are the "consummation of BLM's decisionmaking

(sic) process."[166] Plaintiffs do not cite to any text in the Memoranda for support.[167] A "decision

[that is] effectively the last word of the agency" constitutes "final agency action."[168] "[I]t must

not be of a merely tentative or interlocutory nature."[169] In *U.S. Army Corps of Engineers v.*

*Hawkes Co., Inc.*, the Supreme Court held that a pre-permit, "approved jurisdictional decision"

---

[160] BENM Memorandum 8; GSENM Memorandum 7.

[161] GSENM Memorandum 6; *see* BENM Memorandum 7.

[162] BENM Memorandum 7; GSENM Memorandum 6.

[163] BENM Memorandum 7; GSENM Memorandum 6.

[164] BENM Memorandum 8; GSENM Memorandum 7.

[165] BENM Memorandum 4; GSENM Memorandum 4.

[166] Individual Plaintiffs' Opposition to Motions to Dismiss 64; Utah Plaintiffs' Opposition to Motions to Dismiss 63-64.

[167] Individual Plaintiffs' Opposition to Motions to Dismiss 64; Utah Plaintiffs' Opposition to Motions to Dismiss 64.

[168] *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1192 (10th Cir. 2014).

[169] *Bennett*, 520 U.S. at 178 (internal citation omitted).

**Add. 23**

constituted "final agency action" because it was "issued after extensive factfinding by the Corps" and was "typically not revisited if the permitting process move[d] forward."[170]

Conversely, these Memoranda are only preliminary, internally directive, informative, and suggestive. The phrase "interim guidance" is mentioned at the very beginning and throughout.[171] The Memoranda "provide[] specific direction to ensure that, until the new [joint management] plan is prepared, the BLM will manage the [National Monuments] in a manner consistent with [the Proclamations].[172] The Memoranda do not give new information. They simply inform BLM-UT how they should comply with the Proclamations until the 2024 management plan is created.

The Memoranda reference the actions directed in the Proclamations and the monument management plans (forthcoming before March 1, 2024[173]) as the source of any direction.[174] The Memoranda themselves do not give any requirements. They are simply a connector between the Proclamations and future monument management plans.

The Memoranda also reference other documents as controlling (the BLM Manual,[175] CFRs,[176] and the Omnibus Act[177]). But, again, the Memoranda do not give any order or compel any action.

The Memoranda contain language that suggests more guidance could come:

> More specific guidance regarding particular types of uses and activities follows. Note, however, that this guidance is not intended to be comprehensive; additional,

---

[170] 578 U.S. 590, 597–98 (2016).

[171] GSENM Memorandum 1, 2, 6; BENM Memorandum 1, 2, 6.

[172] BENM Memorandum 2; GSENM Memorandum 1-2.

[173] BENM Memorandum 1; GSENM Memorandum 1.

[174] BENM Memorandum 1-7; GSENM Memorandum 1-7.

[175] BENM Memorandum 2, 5, 7; GSENM Memorandum 2, 5, 6.

[176] BENM Memorandum 2-3; GSENM Memorandum 2.

[177] BENM Memorandum 2; GSENM Memorandum 3.

detailed direction may be provided as particular issues are identified, including through the decision making and public involvement processes.[178]

Nothing in the Memoranda suggest that they are anything more than informative dicta and internal agency direction.

### (3)    The Memoranda do not "generate legal consequences"

Plaintiffs allege that the Memoranda "generate legal consequences"[179] and "determine rights or obligations."[180] Final agency action must have "direct and appreciable legal consequences."[181] Agency action that binds multiple agencies and prohibits them from bringing a lawsuit against a property owner for five years has legal consequences.[182] Or a document may be agency action if it "warns…of incurring criminal penalties;" "issue[s] a cease and desist order" that is "enforceable by the courts;" or "revo[kes] [a] certificate or permit."[183] Agency action that "carries no direct consequences" and "serves more like a tentative recommendation than a final and binding determination" is not final.[184] The Memoranda are "purely advisory."[185]

Plaintiffs allege legal consequences based on the statement in the Memoranda: "no new mining claims may be located, and no new mineral leases may be issued."[186] This is incorrect. The Memoranda only quote the Proclamations, and then summarize them: "Therefore, no new mining claims may be located, and no new mineral leases may be issued, on lands within the

---

[178] BENM Memorandum 5; GSENM Memorandum 5.

[179] Individual Plaintiffs' Opposition to Motions to Dismiss 65.

[180] Utah Plaintiffs' Opposition to Motions to Dismiss 65.

[181] *Bennett*, 520 U.S. at 178.

[182] *U.S. Army Corps of Engineers*, 578 U.S. 590, 598-99 (2016).

[183] *Frozen Food Exp. v. United States*, 351 U.S. 40, 44 (1956).

[184] *Franklin*, 505 U.S. at 798.

[185] *Bennett*, 520 U.S. at 178.

[186] Amended Complaint 91 ¶¶ 387, 395; Individual Plaintiffs' Opposition to Motions to Dismiss  65.

monument."[187] The Memoranda do not add new restrictions, as Plaintiffs allege. The Memoranda do not warn of civil penalties or trigger criminal punishments, nor do they impose fines. They frequently cite to or quote the Proclamations. They do not create anything new that was not already created by the Proclamations. The Memoranda do not impose legal consequences, nor do they declare rights or obligations.

The Biden Proclamations are the source of BLM's obligations, and the Memoranda merely summarize the effects. They are not "final agency action" and therefore are not reviewable under the APA.

**Individual Plaintiffs do not have standing to bring the claim for denial of permits**

Individual Plaintiffs allege "[they] have been harmed when they have had federal permits denied as a result of President Biden's proclamations and their implementing regulations."[188] Individual Plaintiffs claim that "[a] permit denial is "final agency action."[189] "Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13)."[190] The first requirement of 5 U.S.C. § 702 is "the person claiming a right to sue must identify some 'agency action' that affects him in the specified fashion."[191] "The burden is on the party seeking review under § 702 to set forth specific facts…showing that he has satisfied its terms."[192]

---

[187] BENM Memorandum 2; GSENM Memorandum 2.

[188] Amended Complaint 90 at 193.

[189] *Id.*

[190] *Colorado Farm Bureau Fed'n v. U.S. Forest Service*, 220 F.3d 1171, 1173 (10th Cir. 2000).

[191] *Lujan*, 497 U.S. at 882.

[192] *Id.* at 884.

**Add. 26**

Individual Plaintiffs do not specify in their "claims for relief" what specific permit was denied; which agency denied it; or specifically when it was denied.[193] Individual Plaintiffs did state in the body of the Amended Complaint that BLM Defendant "denied the [Utah/Arizona ATV] Club's request" "for a special recreation permit to host part of its Jamboree on Inchworm Arch Road."[194] Individual Plaintiffs allege that the Utah/Arizona ATV Club ("the Club") was granted a permit for this event in 2020 and 2021 by BLM.[195] And in 2022, "[t]he only intervening change was that President Biden had issued his proclamations, and BLM had issued its interim management plan[196] implementing them."[197]

Even if the specific statement in the body of the amended complaint is sufficient, the Club does not have standing to bring this claim. The Club is "an outdoor off-highway vehicle recreation club" that "boasts a number of members from Utah" and is a member of BlueRibbon Coalition.[198]

The Club is not a party to this lawsuit. The Club is only a member of the BlueRibbon Coalition. BlueRibbon "is a 501(c)(3) non-profit that has worked to protect access to public lands…since 1987."[199] It "is a membership-based organization, with thousands of members across every State in the country."[200] "In Utah, BlueRibbon has…almost 30 members who are business or organizations."[201]

---

[193] Amended Complaint 90 at 193.

[194] *Id*. at ¶ 108.

[195] *Id*. at ¶¶ 106-07.

[196] Apparently a reference to the Memoranda.

[197] *Id*. at ¶ 108.

[198] *Id*. at ¶ 104.

[199] *Id*. at ¶ 80.

[200] *Id*.

[201] *Id*. at ¶ 81.

**Add. 27**

> [An] "entire 'program'—consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of the respondent's members.[202]

The Club is not joined as a party to this action, so Individual Plaintiffs cannot seek for relief for a permit denied to the Club.

## CONCLUSION

In spite of the sincere and deeply held view of the Plaintiffs, there is no relief for them in this action.

> It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review.[203]

President Biden's judgment in drafting and issuing the Proclamations as he sees fit is not an action reviewable by a district court.

## ORDER

Federal Defendants' and Tribal Nations' motions to dismiss are hereby GRANTED with prejudice. The clerk is directed to close the case.

Signed August 11, 2023.

BY THE COURT

David Nuffer
United States District Judge

---

[202] *Lujan*, 497 U.S. at 893.

[203] *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940).

28

**Add. 28**

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| GARFIELD COUNTY, UTAH, a Utah political subdivision; KANE COUNTY, UTAH, a Utah political subdivision; THE STATE OF UTAH, by and through its Governor, SPENCER J. COX, and its Attorney General, SEAN D. REYES;<br>*Plaintiffs*,<br><br>ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS;<br>*Consolidated Plaintiffs*,<br><br>v.<br><br>JOSEPH R. BIDEN, JR. in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; TOM VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; FOREST SERVICE;<br>*Defendants*,<br><br>HOPI TRIBE, NAVAJO NATION, PUEBLO OF ZUNI, and UTE MOUNTAIN UTE TRIBE;<br>*Intervenor-Defendants,*<br><br>SOUTHERN UTAH WILDERNESS ALLIANCE, CENTER FOR BIOLOGICAL DIVERSITY, GRAND CANYON TRUST, GREAT OLD BROADS FOR WILDERNESS, NATIONAL PARKS CONSERVATION ASSOCIATION, NATURAL RESOURCES DEFENSE COUNCIL, SIERRA CLUB, THE WILDERNESS SOCIETY, WESTERN WATERSHEDS PROJECT, and WILDEARTH GUARDIANS.<br>*Intervenor-Defendants*. | **JUDGMENT IN A CIVIL CASE**<br><br>Case No. 4:22-cv-00059-DN-PK<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

**Add.29**

IT IS ORDERED AND ADJUDGED THAT

Plaintiffs' causes of action are dismissed with prejudice.


Signed August 11, 2023.

BY THE COURT

David Nuffer
United States District Judge

2

**Add.30**